**Murray ALLISON and Isabel Sperber, Plaintiffs,**

v.

**BROOKTREE CORPORATION, James A. Bixby, Jerry E. Canning, Stewart Kelly, Robert W. Zabaronick, David C. Gelvin and Edward P. Holtaway, Defendants.**

**No. 97-0852 JM(POR).**

United States District Court, S.D. California.

March 10, 1998.

---

William S. Lerach, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, for plaintiffs.

Paul R. Bessette, John B. Missing, Christopher Harold McGrath, Brobeck Phleger & Harrison, San Diego, CA, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; GRANTING LEAVE TO AMEND

MILLER, District Judge.

Defendants Brooktree Corporation ("Brooktree"), James A. Bixby, Jerry E. Canning, Stewart Kelly, Robert W. Zabaronick, David C. Gelvin and Edward P. Holtaway move to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Plaintiffs Murray Allison and Isabel Sperber oppose the motions. Having carefully considered the papers submitted, the record before the court, the oral arguments of counsel, and the applicable authority, the court grants Defendants' motion to dismiss and grants plaintiffs 45 days from the date of entry of this order to file an amended complaint.

## BACKGROUND

Brooktree is a San Diego based high-tech company that designs, develops and markets high-performance integrated circuits for use with graphics, imaging, communications and multimedia applications. (Compl. ¶ 2). This class action was brought on behalf of all purchasers of Brooktree common stock between February 13, 1995, and February 7, 1996 (the "Class Period"). The essence of the complaint is that Defendants made materially false and misleading statements concerning Brooktree's BtV Media chipset product (the "BtV chipset"). These statements, Plaintiffs allege, indicated that the BtV chipset was technologically superior than competing products, was enthusiastically received in the marketplace, was being incorporated into PC products by several manufacturers and would provide strong revenue and earnings growth for fiscal year 1996, ending September 30, 1996. (Compl. ¶ 1).

The complaint identifies statements made in company press releases, securities analyst reports, media interviews with defendant James Bixby, Brooktree's CEO, and newspaper articles. A sampling of the statements include:

(1) On February 13, 1995, at a securities analyst conference, David Russian, CFO, stated that revenues would be flat until

shipment of the BtV chipset in the fall and that Brooktree has "received strong interest in trade (sic) recent trade shows." (Compl. ¶ 59).

(2) In a newspaper article on March 9, 1995, Defendant Bixby stated, "I think we're on the right track," and "if we're successful we may get 20 percent" of the multimedia market. (Compl. ¶ 60).

(3) In a March 14, 1995 securities report, the analyst stated that "Brooktree appears to be offering a superior product . . . even a modest market penetration rate could have a substantial impact on the company's financial results." (Compl. ¶ 61).

(4) In a May 10, 1995, press release the company announced that several companies had adopted the BtV chipset for integration into planned multimedia products and that Brooktree received several "design wins." (Compl. ¶ 64).

(5) In a June 5, 1995 *PC Week* article it was reported that volume quantities of the chipset are "expected" to be shipped in the fourth quarter. (Compl. ¶ 66).

(6) In a July 12, 1995, press release the company stated that the outlook for Brooktree continued to improve, that the company "felt" positive about the prospects for future growth, and that the company received multiple orders for shipment in the fourth quarter. (Compl. ¶ 68).

(7) In a July 28, 1995 interview, Defendant Bixby stated that Brooktree's "biggest investment" is about to bear fruit, that he "believed" that Brooktree had a product to increase its operating income, that Brooktree had "high expectations" for future growth and that its chipset would have 3-D capabilities in 1996. (Compl. ¶ 69).

(8) In late August 1995, Defendant Bixby informed securities analysts that the company expected a strong ramp up in sales and that it forecast revenues from multimedia products in fiscal 1996 of $50–$80 million. (Compl. ¶ 71).

(9) In late October 1995, Defendants Bixby and Canning allegedly told securities analysts that six companies had placed orders for the BtV chipset, that sales of multimedia products could reach $28 million per quarter by 1996, and that the chipset had a bright future.

(10) In a December 4, 1995 newspaper article Defendant Bixby stated that, after only one quarter, the BtV chipset has had strong sales. (Compl. ¶ 83).

(11) In a January 15, 1996 analyst report, Defendant Bixby informed the market that sales of Brooktree's maturing products had declined and that by mid-year the product should be in a strong growth mode. (Compl. ¶ 86).

As the Class Period ended, Brooktree reported declining revenues and earnings due to weak sales of its BtV chipset. On February 7, 1997, Brooktree's stock, having reached a Class Period high of $21 per share, closed at approximately $8.50 per share.

Plaintiffs allege that at the time the statements were made, Defendants knew:

(1) that the BtV chipset lacked compatible software drivers for numerous operating systems and configurations, that the product suffered numerous compatibility problems, that the product was difficult to install and support add-in cards and software drivers, that the BtV product could not be readily uninstalled, and that Brooktree was too aggressive because it prematurely released the chipset. (Compl. ¶¶ 43–58).

(2) that its BtV chipset had only 2–D capabilities even though 3–D capabilities were rapidly becoming very important in the multimedia market. (Compl. ¶ 63(g)).

(3) that initial interest by customers was positive but as customers learned of its performance their interest declined. (Compl. ¶ 70).

(4) that there was no basis for the projections by securities analysts that Brooktree would have BtV chipset sales of $50–80 million in fiscal 1996. (Compl. ¶ 88).

Plaintiffs allege that defendants willfully participated in a scheme and fraudulent course of conduct in order to sell their stock at inflated prices. Plaintiffs also allege that defendants engaged in the fraudulent conduct in order to cash in their stock options at the time of a buy-out offer. In fact, six months after the end of the Class Period, on July 1, 1996, Rockwell announced that it had

agreed to purchase Brooktree for $15 per share.

Defendants now move to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) and the PSLRA.

## DISCUSSION

*A. Legal Standards*

*1. Rule 12(b)(6)*

When ruling on a motion to dismiss, the court must accept all material allegations of fact as true and must construe those allegations in the light most favorable to the nonmovant. *North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 581 (9th Cir.1983). If the complaint fails to state a claim, the court should grant leave to amend unless it appears beyond a doubt the plaintiff would not be entitled to relief under any set of facts proved. *Halet v. Wend Inv. Co.,* 672 F.2d 1305, 1309 (9th Cir.1982).

Courts grant 12(b)(6) relief only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988). Courts must construe the complaint in the light most favorable to the plaintiff. *Russell v. Landrieu,* 621 F.2d 1037, 1039 (9th Cir.1980). Accordingly, courts must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986).

Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995) ("a complaint should not be dismissed unless a plaintiff could prove no set of facts in support of his claim that would entitle him to relief").

The defense of defect in a plaintiff's claim must appear on the face of the complaint; the court cannot consider material outside the complaint, such as facts presented in briefs, affidavits, or discovery materials. *McCalden v. California Library Assoc.,* 955 F.2d 1214, 1219 (9th Cir.1990). However, the moving party may refer to and attach to its papers, and the court may consider, documents to which the plaintiff refers to in the complaint which are not attached to the complaint. *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994). The court may also consider any matter that is subject to judicial notice, such as public records. *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986).

*2. The PSLRA*

In an effort to curtail the filing of perceived abusive lawsuits, Congress enacted the PSLRA to establish a uniform pleading standard:

**(b) Requirements for securities fraud actions**

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b).

## B. Plaintiffs' 10b–5 Claims

### 1. The Statements

The court has little difficulty in concluding that many of the allegedly false and misleading statements contained in the complaint either comply with both Rule 9(b) and the PSLRA or can be amended to comply with these requirements. The specific arguments raised by defendants in their moving papers and oral arguments are discussed below.

#### a. Complaint ¶¶ 59–62

■ The essence of these allegations consists of statements that the BtV chipset has "received strong interest in trade [sic] recent trade shows," "I think we're on the right track," "If we're successful, we may get 20 percent," "Brooktree appears to be offering a superior product," the BtV chipset was "on track" to ship in July/August, and that the new chipset "would be the significant driver of Brooktree's future earnings growth." (Compl. ¶¶ 59–62). These statements, issued between February 13 and April 12, 1995, must be viewed in context. That is, that the product was still in the developmental stages with shipment to occur in the fourth fiscal quarter of 1995. The adverse facts pled in ¶ 63 fail to identify the time frame that defendants allegedly knew of the "true facts."

Another difficulty with these statements is that they can easily be viewed as vague statements of optimism particularly in light of the facts pled that the BtV chipset was still in the design stage of development. To represent that "I think we're on the right track," "If we're successful," "appears to be offering a superior product," "would be significant," are generally "soft," not actionable, statements of vague projections of future performance. See Raab v. General Physics Corp., 4 F.3d 286, 289–90 (4th Cir.1993). The adverse facts, viewed in context, support this view. The thrust of the adverse facts is that defendants knew that the product had encountered hardware and software problems during the developmental phase of the BtV chipset. In bringing any high-tech product to market, problems encountered in the early developmental stages are the norm,

not the exception. Notably absent are allegations that Brooktree had encountered any insurmountable problems, or the problems were of such magnitude that Defendants knew the projected release dates to be unrealistic, or any other fact that would undermine the tentative and vague nature of these statements.

Plaintiffs are granted leave to amend to allege temporal facts and any additional allegations that would undermine the tentative and vague nature of the allegedly false and misleading statements.

#### b. Complaint ¶¶ 64–69

■ The essence of these statements, issued between May 10, 1995, and July 28, 1995, is that Brooktree is "signing up numerous customers," shipment is to commence in the fourth fiscal quarter (July 1 through September 30), the "outlook for Brooktree continued to improve," "Brooktree was encouraged by the prospects for rapid and broad acceptance" of its chipset, Brooktree's "biggest investment we've made in multimedia is about to bear fruit," the "design wins" are significant and "come in units of $5 to $50 million a year of revenue, so these are significant," and that "we have high expectations because of the size of the market and the product positioning that it will be a primary growth driver in the corporation." (Compl. ¶¶ 64–69). These statements lack the tentative and qualified nature of the previous statements. The complaint alleges adverse facts showing that the customers had encountered serious problems with the BtV chipsets, the defects were causing customers to loose interest, that Brooktree was not making any significant progress toward making volume shipments because of technical problems, and that 3–D products were entering the market thus reducing demand for 2–D products. (Compl. ¶ 70). These allegations comply with Rule 9(b) and the PSLRA.

Defendants contend that the reporting of "design wins" is not actionable because it is mere reporting of a historical fact. (Defendants Brief p. 10). Although literally true, the context of the statement, in light of Defendant Bixby's statement that each design win could generate $5 to $50 million in revenue, raises an issue of fact that could mislead

investors. *See In re Convergent Technologies Securities Litig.,* 948 F.2d 507, 512 (9th Cir.1991). Similarly, the court rejects Defendants' contention that statements contained in Brooktree's SEC filings bespeak caution. To begin with, whether or not the cautionary language was disseminated to the market to such an extent as to cancel out the impact of the allegedly false and misleading statements raises a question of fact not appropriately decided on a motion to dismiss. *See Fecht v. Price Co.,* 70 F.3d 1078, 1082 (9th Cir.1995).

### c. Complaint ¶¶ 71–87

The essence of these allegations, issued from late August 1995 through January 22, 1996, is that "there was a very positive outlook for the product," "would lead to total fiscal 1996 revenues of $190 + million and earnings of close to $1 per share," "a dozen leading PC system" companies will adopt the BtV chipset, "a 10% share of this market could double Brooktree's size," "production volumes" expected in late December or January 1996, sales of the BtV chipset could reach "$28 million per quarter," "Brooktree laid out a plan that could more than double its current revenue in the next few years," Brooktree's chipset "has · had strong sales after only one quarter," Brooktree had "purchase orders for production volumes in the second fiscal quarter," and "our new products will enable us to enter new, emerging markets to help fuel the Company's next phase of growth." (Compl. ¶¶ 71–87). The reasons why these statements were allegedly false and misleading are essentially the same as those discussed above. (Compl. ¶ 88). Each of the allegedly false statements is identified and explanations are provided as to the falsity of each statement. Nothing more is required.

### 2. The Analyst Statements

Defendants move to dismiss all allegations based on representations made by analysts or other third parties. (Compl. ¶¶ 59, 61, 62, 65–68, 71, 75, 78, 80, 83, 84, 86). In so doing, Defendants assert that the particularity requirements of Rule 9(b) require plaintiffs to allege (1) specific forecasts and name the issuer who adopted them; (2) point to specific interactions between the insider and analyst which gave rise to the entanglement; and (3) state the dates of the acts which allegedly gave rise to the entanglement activity. (Defendants Brief, p. 13:2–5). *See In re Valence Tech. Sec. Litig.,* [1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,793 (N.D.Cal. May 8, 1995).

To be held liable for unreasonably disclosed third-party statements, not only must the statements comply with Rule 9(b) but defendants must have put their imprimatur, express or implied, on the projections or statements. *In re Syntex Corp. Securities Litig.,* 95 F.3d ⸝922, 934 (9th Cir. 1996). In the context of analyst statements, Rule 9(b) is satisfied where it is alleged "that the insider provided misleading information to an analyst, that the analyst relied on this information in preparing a report and that the insider somehow endorsed or approved the report prior to or after its publication." *Stack v. Lobo,* 903 F.Supp. 1361, 1372 (N.D.Cal.1995).

The complaint makes conclusory allegations that "analysts relied in substantial part upon information" provided by Brooktree, (Compl. ¶ 32), "Brooktree and defendants Bixby, Canning and Gelvin communicated regularly with securities analyst" by means of conference calls, analysts meetings, and interviews with Bixby, (Compl. ¶ 34), "Brooktree directly and indirectly caused these analysts to issue false and misleading reports that contained false and misleading information about the Company and its prospects," (Compl. ¶ 35), and that Brooktree "used the analysts as conduits of misinformation." (Compl. ¶ 36). These conclusory allegations are insufficient to establish that Defendants could have controlled the content of any of the statements disseminated by analysts. The analysis does not end here, however, as certain analyst or third party statements provide the requisite detail and comply with Rule 9(b).

For example, the Complaint alleges a detailed dialogue between Bixby, Canning and Smith Barney analysts as well as identifying the date of the analyst report, its contents, the report's author, and allegations that Bixby and Canning reviewed and approved the report. (Compl. ¶ 61). This allegations sufficiently pleads a basis for liability

as to defendants Bixby and Canning for statements of third parties. To the extent reasonably available to Plaintiffs, the allegations must contain sufficient detail to give rise to an inference that Defendants endorsed or adopted the statements of analysts to such an extent such that it could be fairly said that defendants placed their imprimatur on the statements. *See In re Syntex Corp. Securities Litig.*, 95 F.3d 922, 934 (9th Cir. 1996).

Other third party analyst statements fail to allege a sufficient basis for liability. For example, paragraph 62 alleges that Bixby spoke with unidentified securities analysts and made several positive statements about Brooktree's future business prospects. In conclusory fashion, the allegation states that "[a]nalysts reported this information to the market where it became part of the total mix of information." There is no indication when, who, what, or how the allegedly false statements were disseminated to the market. Moreover, there is no indication that any defendant adopted, controlled, or otherwise sufficiently entangled themselves with this statement such that liability could fairly be attributed any defendant. Therefore, paragraphs 59, 62, 65, 67, 68, 75, 78, 80, 83, 84, and 86 are dismissed with leave to amend.

### 3. The Group Published Doctrine

■ Defendants Kelly (Vice President of the Communications Strategic Business Unit), Zabaronick (Vice President of Human Resources) and Holtaway (Vice President of Corporate Quality) move to dismiss the complaint because it fails to allege a factual basis for liability under PSLRA. The complaint does not allege that these defendants made any misleading statements during the class period nor does the complaint allege that these defendants communicated to any securities analyst or any investor. The complaint does allege in conclusory fashion that these defendants each had access to unspecified non-public information, they sold stock during the Class Period, and that these defendants knew the truth of the statements and omissions made therein. (Compl. ¶¶ 23(d), (e), (f)).

In apparent recognition that the complaint fails to articulate any actionable conduct by these defendants, plaintiffs seek to invoke the group-published doctrine. In pre–PSLRA actions, allegedly false and misleading statements contained in group-published information such as prospectuses, registration statements, annual reports, and SEC filings benefit from a presumption that the statement contained therein is part of a collective work and therefore plaintiffs are excused from the particularity requirements of Rule 9(b). *In re GlenFed, Inc.*, 60 F.3d 591 (9th Cir.1995). To rely upon this presumption, "plaintiffs' complaint must contain allegations that ... [the defendant] either participated in the day-to-day corporate activities or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." *Id.* 60 F.3d at 593. This doctrine does not apply to information contained in analyst reports or oral remarks of other individuals.

Here, the court dismisses these defendants, without prejudice, for two reasons. To begin with, the continued vitality of the judicially created group-published doctrine is suspect since the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be plead in regards to "each act or omission" sufficient to give "rise to a strong inference that *the defendant* acted with the required state of mind." 15 U.S.C. § 78u–4(b) (emphasis added). To permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant. The group published doctrine permits an inference of wrongdoing not based on defendant's conduct, but based solely on defendant's status as an officer or director of a corporation. Accordingly, should plaintiffs decide to file an amended complaint they are instructed to plead specific facts as to the misleading statements and omissions as to each defendant.

The second reason for dismissing these individuals is that the group published presumption "is grounded in reasonableness" and it is not reasonable to presume in every case that every officer joined in a scheme to defraud investors. *In re GlenFed*, 60 F.3d at

593. The court observes that plaintiffs fail to allege, with one exception, any material false or misleading statements or omissions contained in any group-published document. One group published document, the 1995 Annual Report represented that Brooktree's "multimedia, communications and imaging ... will enable us to enter new, emerging market to help fuel the Company's next phase of growth," and that it had made steady progress with the BtV chipset and that more than a dozen vendors adopted the BtV chipset into planned products. (Compl. ¶ 87). Although Plaintiffs adequately allege that this Annual Report was either false or misleading, (Compl. ¶ 88), it is unreasonable to presume, under the facts alleged and the requirements of Rule 9(b), that the Human Resource Officer, the Communications Business Unit Officer, or the Corporate Quality Officer had either direct or indirect involvement with the preparation or communication of information following outside their respective fields of expertise and spheres of influence: human resources, the communications business unit, and quality assurance. As to each of these defendants plaintiffs assert identical conclusory allegations that they had "access to internal corporate documents." (Compl. ¶ 23(c), (d), (f)). Without additional allegations demonstrating the reasonableness of applying the presumption to these defendants, these defendants are dismissed without prejudice and with leave to amend.

### 4. Scienter

The PSLRA provides that securities fraud complaints, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).[1] Defendants contend, with supporting statements from Conference Committee Reports, that "strong inference" of scienter requires plaintiffs to set forth specific facts that constitute strong circumstantial evidence of conscious behavior by defendant. *In re Silicon Graphics, Inc. Sec. Litig.,* [1996–1997 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶¶ 99,325, 95,-961–62 (N.D.Cal.1996); *Friedberg v. Discreet Logic Inc.,* 959 F.Supp. 42, 49–50 (D.Mass.

1997). Plaintiffs, on the other hand, contend that Congress intended to adopt the Second Circuit's standard that a strong inference of scienter can be established by "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2nd Cir.1994).

The precise contours of the "strong inference" standard will no doubt be subject to debate for years to come. On a theoretical level, each of the proposed strong inference tests may, depending on the circumstances, give rise to a strong inference of scienter, that is, an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Accordingly, the pleading standard may be satisfied by applying any of these standards.

Plaintiffs contend that they satisfy both the motive plus opportunity test and the recklessness test. *See In re Time Warner Inc. Securities Litig.,* 9 F.3d 259, 269 (2nd Cir.1993), *cert. denied sub nom.,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).

### a. The Motive Plus Opportunity Test

Plaintiffs assert that defendants, as controlling and managing officers, spoke to investors, analysts and the market and generated and reported Brooktree's financial forecasts and results. (Compl. ¶¶ 23, 27, 34–38). Under these circumstances, plaintiffs assert, "no one doubts that the defendants had the opportunity, if they wished, to manipulate the price of stock." *Time Warner,* 9 F.3d at 269. These conclusory assertions hardly comply with the requirement that the complaint set forth as to "each statement" particular facts giving rise to a strong inference of scienter as to each defendant. Plaintiffs cannot lump all defendants together by conclusory allegations that "they controlled the dissemination of, and could thereby falsify, information about Brooktree's business and finances which reached the investing public and affected the price of Brooktree

---

1. The court rejects plaintiffs argument that the PSLRA does not apply to this action. By its own terms, the PSLRA applies to any action commenced after December 22, 1995. *See In re Silicon Graphics,* 970 F.Supp. at 753–54.

stock." (Compl. ¶ 27). The Complaint generally alleges that only defendants Bixby, Gelvin, and Canning communicated with the media. (Compl. ¶¶ 60–62, 64, 65, 67–69, 71, 73–75, 77–84, 86, 87).

In order to satisfy the opportunity portion of the test, the Complaint must allege a combination of circumstances wherein defendants have, at a minimum, (1) access to the channels of communication such that a defendant can effectively disseminate false and misleading information to the investing public either directly or indirectly and (2) access to specific non-public, internal information regarding the allegedly false and misleading statements. *See Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185 (2nd Cir. 1995) (stating that "clear opportunity arises when the defendant is already well positioned to carry out the fraudulent transaction, such as when he possess the necessary trust and authority"). As to defendants Bixby (CEO), Canning (Corporate Controller), and Gelvin (V.P., Multimedia Strategic Business Unit) the complaint adequately alleges opportunity based, in part, on their positions at Brooktree, reporting requirements, corporate responsibilities, access to all corporate information, and actual involvement in the dissemination of Brooktree's financial and business information.

Allegations of opportunity as to defendants Zabaronick (Human Resource VP), Holtaway (Corporate Quality VP), and Kelly (Communications Strategic Business Unit VP) are less clear. In essence, Plaintiffs allege "that defendants falsely represented the capabilities, customer acceptance and revenue generating potential of its BtV" chipset. (Plaintiffs' Opposition p. 1:2–4). The complaint is ambiguous on the issue of clear opportunity for these defendants: it is difficult to understand—given these defendants' respective fields of expertise, the nondescript allegations of access to internal documents, and the

lack of direct or indirect access to the media—how these defendants would have the opportunity to control the dissemination of general business and financial information to the market. The complaint sets forth the same boilerplate allegations that each defendant had access to unspecified internal corporate documents, attended management meetings, and obtained reports of information. (Compl. ¶¶ 23(c), (d), (e), (f)). How these defendants obtained the opportunity to directly or indirectly disseminate allegedly materially false and misleading to the market is not specified in the complaint. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies*, 75 F.3d 801, 812 (2nd Cir.1996). As such, Plaintiffs fail to plead the requisite opportunity by defendants Zabaronick, Kelly, and Holtaway.

Next, Plaintiffs contend that Defendants were motivated to engage in securities fraud in order to sell stock and to cash-out their options in a later acquisition. (Compl. ¶¶ 27–29). "Insider trading in suspicious amounts or at suspicious time is probative of bad faith and scienter." *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1117 (9th Cir.1989). Plaintiffs do not contend that Defendants sold stock at suspicious times but contend that the amounts sold are suspicious and probative of scienter.[2]

Since scienter must be pled as to each defendant, the court analyzes the stock sales of each defendant. Plaintiffs allege no stock sales by the alleged primary wrongdoer, Bixby. Nearly every communication to investors and the media was made by Bixby. Not only did Bixby not sell any shares, he actually purchased stock during the Class Period.[3] The facts pled negate an inference of motive to defraud by Bixby. The Complaint alleges that defendant Canning sold 2,200 shares for gross proceeds of $41,328 and defendant Gelvin sold 2,000 for gross proceeds of $32,760.[4]

---

2. The Complaint's allegations do not support insider trading at suspicious times. Nearly 90% of all insider shares sold during the Class Period were at or below $13 per share, which is 40% off the high of $21.75 and occurred four to five months before the stock reached its Class Period high.

3. The court takes judicial notice of Bixby's Form 4 wherein he reported the purchases to the SEC.

Judicial notice of documents required to be filed by law is appropriate. *See Kramer v. Time Warner*, 937 F.2d 767, 774 (2nd Cir.1991).

4. The net proceeds to these defendants were significantly less than the gross amounts received because defendants exercised options to purchase those shares at $6.00 to $7.12 per share. (Compl. ¶¶ 23(b), 23(c)).

The amounts sold represent approximately 82% and 14%, respectively, of the shares then available for sale. (Compl. ¶ 93). These amounts are minimal when compared to the proceeds received by defendants as a result of the sale of their options to Rockwell. There, Canning received gross proceeds of approximately $355,000 and Gelvin approximately $670,000.[5]

Given the ambiguous nature and suspect import of the relatively small amount of stock sales traded during the Class Period ($70,-000), the allegations, even taken together, are insufficient to raise a strong inference of fraudulent intent. The court observes that Plaintiffs have a particularly difficult task to demonstrate motive by means of stock sales when the primary alleged wrongdoer was purchasing, and not selling, stock. Since Plaintiffs requested leave to amend at the time or oral argument, the court grants leave to amend the element of scienter.

Plaintiffs also contend, in a classic fraud by hindsight theory, that Defendants were motivated to commit fraud because of the Rockwell buy-out. Plaintiffs contend that scienter is adequately alleged because defendants sought to obtain illicit profits through insider sales and "potentially greater gain from a stock and option cash-out in a later acquisition." (Compl. ¶¶ 27–29). There are at least two difficulties with Plaintiffs' buy-out theory. First, the complaint lacks an ample factual basis to support a strong inference that Defendants were motivated by Rockwell's buy-out offer to commit securities fraud. The complaint makes no allegations that, as the Class Period commenced on February 13, 1995, Defendants were motivated to commit securities fraud because a potential buy-out offer would materialize nineteen months later and six months after the end of the Class Period in September 1996. In the absence of discussions of a buy-out during the Class Period, or other detailed circumstance indicating the feasibility of a buy-out offer, the allegations are too speculative and the complaint fails to adequately allege scienter. The second reason for finding that the complaint fails to adequately allege scienter is

that, as alleged, Defendants did not benefit from an artificially inflated stock price because Brooktree's stock price suffered dramatic declines at the end of the Class Period. As explained in *Zeid v. Kimberley,* 930 F.Supp. 431, 438 (N.D.Cal.1996):

> The problem with Plaintiffs' theory is that the merger did not take place until after Firefox's stock price plummeted. Thus, even if Firefox's stock price was inflated, Defendants did not benefit from it.
>
> Plaintiffs attempt to overcome this fact by generally alleging that Firefox attempted to arrange the acquisition before the disclosure.... However, in alleging scienter a plaintiff cannot base its claims on conclusory allegations, but instead, must provide an ample factual basis to support their charges.

930 F.Supp. at 438. Accordingly, Plaintiffs fail to adequately allege a strong inference of scienter under the motive plus opportunity standard.

*b. The Allegations of Defendants' Reckless Or Conscious Behavior.*

In essence, Plaintiffs contend that the complaint adequately alleges scienter because the complaint identifies numerous positive statements and explains why the statements were false. (Plaintiffs' Opposition p. 19:5–6). Plaintiffs contend that knowing conduct should be inferred because of the "serious problems plaguing the Chipset—Brooktree's sole pathway to the lucrative multimedia market—actual knowledge may be inferred. It would have been, at the very least, reckless of the defendants to speak without determining the true status of their new product." (Plaintiffs' Opposition p. 20:20–24).

The court rejects the notion that the complaint adequately alleges reckless or conscious behavior such that the allegations raise a strong inference of fraudulent intent. Simply alleging that defendants knew the statements to be false, and therefore defendants must have acted recklessly, circumvents the requirement that plaintiffs plead a

---

**5.** Defendants Holtaway, Kelly and Zoltaway sold approximately 1,100, 12,000, and 15,000 shares during the Class Period and 63,001, 21,793, and 101,500 shares at the time of the Rockwell buy-out. As with the other defendants the stock sales during the Class Period are minimal when compared to the shares sold at the time of the Rockwell buy-out.

strong inference of scienter. Plaintiffs fail to allege sufficient factual basis to plead a strong inference of scienter.

> Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.

*Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987) *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

■ Here, the complaint falls short of pleading "facts constituting circumstantial evidence of either reckless or conscious behavior." *In re Time Warner,* 9 F.3d at 269. Plaintiffs fail to set forth sufficient contemporaneous facts to support their assertions of knowledge and recklessness. Plaintiffs simply allege, in circular fashion, that if Defendants knew the statements to be false then the statements were either consciously or recklessly made. The present action is unlike the allegations contained in *Cosmas v. Hassett,* 886 F.2d 8 (2d Cir.1989). There, the court found both motive and the requisite conscious fraudulent intent. *Id.* at 12–13. Not only did defendants profit from an inflated market price before the truth became known, but defendants made statements that the People's Republic of China was an "important new source of revenue," the company's revenues continued to improve because of its institutional sales (i.e. its sales to China), China was an important segment of the company's sales, and, as a result, the company forecast increased earnings and sales. At the time these positive statements were made, however, the complaint alleged that China had imposed import restrictions on the company's products. The court concluded that there was no basis to represent increased sales to China because "at the time the allegedly fraudulent statements were made, [defendants] had knowledge of the PRC import restrictions." Thus, with the imposition of import restrictions, the court concluded that defendants must have known that continued sales were no longer feasible and therefore defendants possessed the requisite fraudulent intent. *Id.* at 13.

Plaintiffs' allegations are not analogous to *Cosmas.* The present action primarily alleges product development problems, customer acceptance problems and the impact of these problems on Brooktree's revenue generating stream. Unlike *Cosmas* where knowledge of a single factual circumstance (i.e. the import restrictions) is sufficient, in combination with the alleged motive, to establish conscious behavior, the present complaint is less clear, less focused, and fails to allege strong circumstantial factual allegations of conscious behavior. For example, the Class Period commences with public statements that Brooktree has received strong interest in its BtV chipset and that the new product, while still in development, could be a significant driver in Brooktree's future earnings growth. (Compl. ¶ 59–62). While the complaint generally alleges that Brooktree had encountered problems bringing the product to market, there is no indication that the problems were insurmountable or otherwise analogous to a situation where the product, like in *Cosmas,* was unsaleable under any circumstance. The next grouping of statements disseminated in the May through July 1995 time frame, while less tentative than the first grouping of statements, generally alleges that Brooktree's products were being incorporated into various designs and that shipping would commence in the fourth quarter of 1995. The complaint alleges that the product, while still in the developmental phase, was not fully functional, that Brooktree had received few firm orders for the product and 3–D products were entering the market which would reduce the demand for 2–D products. Again, the complaint fails to demonstrate that the product problems were insurmountable or otherwise describe circumstances from which it may be inferred that the products were unsaleable.

Commencing in November 1995, the Complaint alleges, among other things, that Brooktree would have sales increasing quarterly sales of $28 million for its BtV chipset, that the chipset would contribute to earnings growth in 1996, and that production volumes of the chipset would commence in December 1995, or January 1996. (Compl. ¶¶ 78–83). Unlike the earlier statements, shipping products with allegedly known defects may give rise to a strong inference of scienter. The difficulty with these statements, however, is

that the complaint fails to attribute third party analyst statements to Defendants. If the statements are those of the analysts, as previously discussed, and not attributable to the Defendants, there can be liability under the Rule 10b–5. Accordingly the court grants defendants' motion to dismiss on the issue of scienter but grants plaintiffs leave to amend the complaint.

*B. Control Person Liability*

Defendants Bixby and Canning also move to dismiss the control person allegations under Section 20(a). Section 20(a) imposes joint and several liability on any "person who, directly or indirectly controls any person liable" for securities fraud "unless the controlling person acted in good faith and did not directly or indirectly induce" the violations. In order to state a claim for control person liability, Plaintiffs must allege "actual power or influence" over the company. *See Gray v. First Winthrop Corp.,* 776 F.Supp. 504, 510 (N.D.Cal.1991). Plaintiffs allege that defendants Bixby and Canning exercised actual control over Brooktree. However, because Plaintiffs have failed to allege a primary violation of the securities laws, they cannot state a claim for control person liability. Accordingly, Defendants motion to dismiss is granted without prejudice.

Having carefully considered the papers submitted, the record before the court, the oral arguments of counsel, and the applicable authority, the court grants Defendants' motion to dismiss and grants Plaintiffs 45 days from the date of entry of this order to file an amended complaint.

**IT IS SO ORDERED.**