**In re: NICE SYSTEMS, LTD. SECURITIES LITIGATION**

**No. CIV.A. 99–1693 AJL.**

United States District Court, D. New Jersey.

March 8, 2001.

Richard H. Weiss, Bruce D. Bernstein, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Lead Counsel for Plaintiffs.

Peter S. Pearlman, Cohn Lifland Pearlman, Herrmann & Knopf LLP, Saddle Brook, NJ, Gary D. Ansel, Reinhardt & Anderson, Saint Paul, MN, Jules Brody, Aaron L. Brody, Stull, Stull & Brody, Joseph H. Weiss, Weiss & Yourman, New York City, for Plaintiffs.

Samuel Kadet, James W. Brown, Skadden, Arps, Slate, Meagher & Flom, Newark, NJ, for Defendants.

## OPINION

LECHNER, District Judge.

This is an action for securities fraud brought on behalf of purchasers of Ameri-

can Depository Shares ("ADSs")[1] of Nice Systems, Ltd. ("NSL"), seeking damages for violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Damages are sought from NSL, David Arzi ("Arzi"), Benjamin Levin ("Levin") and Mordechai Golan ("Golan") (collectively, the "Defendants"). Jurisdiction is alleged pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

Currently pending is a motion to dismiss (the "Motion to Dismiss") the second amended complaint (the "Second Amended Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Lead plaintiffs Marvin Frank ("Frank"), Brian Glogower ("Glogower"), Pradeep Jain ("Jain"), Daniel Laser ("Laser") and Jeffrey Rubin ("Rubin") (collectively, the "Lead Plaintiffs") brought suit on behalf of purchasers of NSL ADSs between 4 February 1998 and 24 September 1998 (the "Class Period").[2] For the reasons set forth below, the Motion to Dismiss is granted.

*Facts*[3]

A. *Procedural History*

On 24 May 1999, an order was filed consolidating *Marvin Frank v. Nice Systems, Ltd., David Arzi, Benjamin Levin and Mordechai Golan,* Civil Action No. 99–1307(AJL) and *James Bell v. Nice Systems, Ltd., David Arzi, Benjamin Levin and Mordechai Golan,* Civil Action No. 99–1693(AJL) (the "24 May 1999 Order of Consolidation"). 24 May 1999 Order of Consolidation. By order, dated 11 June 1999, (the "11 June 1999 Order") Frank, Glogower, Jain, Laser and Rubin were appointed lead plaintiffs. 11 June 1999 Order. The law firm of Milberg Weiss Bershad Hynes & Lerach was appointed lead counsel. *Id.*

The Lead Plaintiffs filed a consolidated amended complaint (the "First Amended Complaint"). Thereafter, Defendants submitted a motion to dismiss the First Amended Complaint (the "First Motion to Dismiss"). In their brief in opposition to the First Motion to Dismiss, the Plaintiffs included a footnote requesting an opportunity to file yet another amended complaint.

On 24 January 2000, a telephone conference was conducted with counsel (the "24 January 2000 Conference"). During the 24 January 2000 Conference, Plaintiffs were given an opportunity to amend the First Amended Complaint:

> COURT: Mr. Pearlman[4], do you want an opportunity to amend the complaint?
>
> \* \* \* \* \* \*

---

1. Each NSL ADSs represents one ordinary share. Second Amended Complaint at ¶ 12. During the class period, Nice ADSs were traded on the Nasdaq National Market ("NASDAQ") under the symbol "NICEY." *Id.* As of 11 May 1998, NSL had more than eleven million shares outstanding, including NSL ADSs. *Id.*

2. In support of the Motion to Dismiss, the Defendants submitted: a Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Complaint (the "Moving Brief"); and a Reply Memorandum of Law in Further Support of De-fendants' Motion to Dismiss the Second Amended Complaint.
 In opposition to the Motion to Dismiss, Lead Plaintiffs submitted: Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint (the "Opposition Brief").

3. The facts are taken from the Second Amended Complaint and are accepted as true. *See* pp. 565–66 *infra.*

4. Peter S. Pearlman, an attorney with Cohn Lifland Pearlman Herrman & Knopf

PEARLMAN: I suspect yes.

COURT: I'm going to give you the opportunity to amend if you want to.

\* \* \* \* \* \*

KADET [5]: You're giving him his last and best chance to address the points we raised.

COURT: That's right.

PEARLMAN: I understand that, your Honor. I will let you know what our desire is midday. If we do elect to amend the complaint, it will be in by the close of business Wednesday.

24 January 2000 Conference, Tr. at 1:10–2:23:

Counsel for Lead Plaintiffs subsequently informed the court of their desire to amend the First Amended Complaint. As a result, an order was entered on 28 January 2000 (the "28 January 2000 Order") denying without prejudice the First Motion to Dismiss and granting Lead Plaintiffs leave to file a second amended complaint. 28 January 2000 Order.

On 11 February 2000, Lead Plaintiffs filed the Second Amended Complaint. On 27 April 2000, Defendants filed a motion to dismiss the Second Amended Complaint; that motion was denied without prejudice to re-filing same, by an order, dated 4 May 2000 (the "4 May 2000 Order").[6] 4 May 2000 Order. Thereafter, the Defendants filed the current Motion to Dismiss. Oral argument was conducted on 20 December 2000.

LLP, represented the Lead Plaintiffs at the 24 January Conference.

5. Samuel Kadet, an attorney with Skadden, Arps, Slate, Meagher & Flom, represented the Defendants at the 24 January 2000 Conference.

6. The 27 April 2000 motion was denied without prejudice for failure to comply with

### B. Parties

#### 1. The Defendants

NSL is an Israeli corporation with its principal place of business located in Ra'anana, Israel. Second Amended Complaint at ¶ 12. NSL describes itself as a global provider of computer telephony integrated logging ("CTIL"), quality measurement and workflow solutions for voice, data and facsimile transmissions. Id. NSL maintains headquarters in the United States at 200 Plaza Drive, Secaucus, New Jersey. Id.

Arzi is a founder of NSL and served as Chairman of the Board of Directors from the inception of NSL, through August 1998. Id. at ¶ 13(a). Arzi continues to serve as a director of NSL. Id. Arzi is alleged to have signed the 1997 Form 20–F [7] on behalf of NSL. Id.

Levin is a founder of NSL and has been a director of NSL since its inception. Id. at ¶ 13(b). Levin has served as the Chief Executive Officer of NSL since February 1998. Id. Levin was also the President of NSL from its inception until August 1998. Id. In August 1998, Levin succeeded Arzi as the Chairman of the Board of Directors of NSL. Id.

Golan, a founder of NSL, has been a director of NSL since 1988. Id. at ¶ 13(c). Golan has served as the Chief Operating Officer since 1997. Id. From 1988 to 1996, Golan served as Chief Engineer and Vice President of Research and Development of NSL. Id. In August 1998, Golan succeeded Levin as President of NSL. Id.

Rule 7.2(b) of the Local Civil Rules. 4 May 2000 Order.

7. Form 20–F is used by foreign issuers to register their securities and to make annual reports under the Exchange Act. 17 C.F.R. § 249.220.

As a result of their positions of control and authority, Arzi, Levin and Golan (collectively, the "Individual Defendants") are responsible for the content of various press releases, Securities and Exchange Commission ("SEC") filings, and other public statements issued by NSL. *Id.* at ¶ 19. The Individual Defendants were provided with copies of said press releases, filings and other statements, before or shortly after their issuance. *Id.* The Individual Defendants, moreover, had the ability and opportunity to prevent the issuance of said press releases, filings and other statements. *Id.*

The Individual Defendants had access to adverse, non-public information, as a result of (1) their ability to view internal corporate documents, (2) conversations and other communications and contacts with corporate officers and employees, (3) attendance at meetings of the Board of Directors of NSL, as well as various committees thereof, and ·(4) periodic reports and other information provided to them. *Id.* at ¶ 20.

The Individual Defendants, by reason of their "positions of control and authority," as well as their "substantial holdings and voting control of NSL shares," were controlling persons within the meaning of Section 20(a) of the Exchange Act. *Id.* at ¶¶ 18, 19.

### 2. *The Plaintiffs*

As mentioned, the Lead Plaintiffs represent a class consisting of all persons who purchased NSL ADSs between 4 February 1998 and 24 September 1998. *Id.* at ¶ 1.

### C. *Background*

NSL was founded in 1986, and an initial public offering was completed in Israel in 1991. Second Amended Complaint at ¶ 22. NSL completed a $20 million initial public offering in the United States in 1996. *Id.*

at ¶ 23. In 1997, a follow-up offering of $98 million was completed in the United States. *Id.* NSL shares were traded on the Tel–Aviv Stock Exchange and NSL ADSs were traded on the NASDAQ. *Id.*

During the Class Period, NSL derived the majority of its reported revenues from the sale of its CTIL products. *Id.* at ¶ 24. CTIL products are designed to protect businesses and customers against risks posed by lost or misinterpreted voice, facsimile or data transmissions, and in some instances, to monitor, train and enhance call center agent productivity. *Id.*

In or·about September 1997, NSL acquired Dees Communications, Ltd. ("Dees"), a Canadian corporation. *Id.* at ¶ 27. The acquisition of Dees was important to the CTIL growth plans of NSL. *Id.* This acquisition provided NSL with automated call center monitoring, quality measurement training and agent productivity enhancement products. *Id.* NSL began to market the NiceUniverse version 3.0 and, later, the version 3.1 (the "System"), as an upgraded version of a Dees.product. *Id.* at ¶ 28. The System was designed to serve the low-end and mid-range call center market, *i.e.*, centers which have fewer than 200 to 250 operators receiving calls at a given time. *Id.*

The 1998 Form 20–F of NSL indicated that NSL generated revenues of $91 million, of which approximately $85.8 million were attributed to sales of the CTIL products. *Id.* at ¶ 24. The 1998 Form 20–F further indicated that NSL markets, distributes and services its CTIL products worldwide, primarily through independent dealers which specialize in the voice logging market, but also through global distribution arrangements with Siemens AG and Lucent Technologies. *Id.* at ¶ 25.

### D. *Factual Allegations*

The allegations of the Second Amended Complaint are based upon an "investiga-

tion conducted by and under the supervision of plaintiffs' counsel." Second Amended Complaint, Preamble. Lead Plaintiffs assert, "except as alleged herein, the underlying information relating to defendants' misconduct and the particulars thereof are not available to plaintiffs and the public and lie within the possession and control of defendants and other NSL insiders." *Id.* According to Lead Plaintiffs, they are prevented from further detailing the misconduct of Defendants at this time because Defendants control the documents. *Id.*

The Second Amended Complaint alleges that NSL raced to the market with upgrades to the NiceUniverse product to enhance its position in the call center market. *Id.* at ¶ 28. The Second Amended Complaint further alleges that the System was promoted as highly innovative and technologically advanced, ready to meet the current needs of call centers, and in compliance with the systems requirements of its various distributors. *Id.*

Lead Plaintiffs allege NSL materially misstated the abilities and readiness of the System. *Id.* at ¶ 29. Lead Plaintiffs further allege NSL failed to disclose the System "was plagued with numerous problems and defects" which hindered its commercial utility. *Id.* In addition, Lead Plaintiffs allege the truth concerning the System was not disclosed until 24 September 1998, when NSL announced its third quarter 1998 results would fall short of the expec-

tations of analysts. *Id.* at ¶ 63. According to the Lead Plaintiffs, the "'difficulties' associated with the introduction of the [System] were responsible for the shortfall in sales." *Id.* In a press release, issued 24 September 1998, NSL stated:

> We have decided to act swiftly to modify our product offering for the low-end and mid-range market and to base it on our well-received high-end solution, providing a better offering to the market. As a result, we anticipate a six-month delay in revenues for this product. [NSL] is planning to release the new and enhanced quality measurement solution for the low-end to mid-range market at the end of 1998. We anticipate that [NSL] will return to its previous growth rate in the beginning of 1999.

*Id.* (citing 24 September 1998 NSL Press Release).

1. *Alleged Materially False and Misleading Statements Made by Defendants During the Class Period*

Lead Plaintiffs allege that NSL issued press releases and made submissions to the SEC which were materially false and misleading. *Id.* at ¶¶ 30–63. According to Lead Plaintiffs, various analysts' reports indicate the market was deceived by the materially false and misleading statements of Defendants.[8] The alleged misleading statements made during the Class Period follow.

---

**8.** It appears from a review of the Second Amended Complaint that Lead Plaintiffs seek to hold Defendants responsible for the following analysts' reports:
1) A CIBC Oppenheimer report, dated 25 February 1998;
2) A CIBC Oppenheimer report, dated 6 May 1998;
3) A BancBoston Robertson Stephens report, dated 9 July 1998;
4) A Lehman Brothers report, dated 5 August 1998;

5) A BancBoston report, dated, 6 August 1998; and
6) A BT Alex. Brown report dated, 7 August 1998.
Second Amended Complaint at ¶¶ 39, 47, 55 and 58.
The Lead Plaintiffs state in the Opposition Brief, however, they "do not at this time allege that [D]efendants are liable for any of the analyst statements referred to in the [Second Amended] Complaint." Opposition Brief at 17 n. 5.

### a. *4 February 1998 Press Release*

On 4 February 1998, NSL issued a press release (the "4 February 1998 Press Release"), published on *PR Newswire*, in which it announced the introduction of the System at the 1998 Call Center Trade Show. *Id.* at ¶ 30. According to the 4 February 1998 Press Release, NSL "unveiled the newest release of its call center performance measurement solution, NiceUniverse, version 3.0 .... The product is integrated with NSL's NiceLog and NiceCLS Systems, and supports the industry's leading switches including Nortel, Lucent and Aspect." *Id.* (quoting 4 February 1998 Press Release). Further, NSL spokesman Morgan Sturdy ("Sturdy"), head of the North American Sales Division of NSL, stated in part:

> The focus of our applications is to address the compliance, performance and risk management issues of the call center. *Our goal* is to offer clients logging and monitoring systems that are easily integrated with their existing computer network and telecom environments.

*Id.* (emphasis added).

### b. *25 February 1998 Press Release*

On 25 February 1998, NSL issued a press release (the "25 February 1998 Press Release"), published on *PR Newswire*, announcing results for both the fourth quarter and the year ending 31 December 1997. *Id.* at ¶ 37. NSL announced net income for the fourth quarter of $4.6 million and net income for 1997 of $13 million. Arzi also stated:

> We have achieved our goal of becoming a global company providing a suite of products for a range of market sectors. I trust that in 1998 we will enjoy another year of continuous growth. We have established technological leadership and a strong competitive position in a dynamic market.

*Id.* (quoting 25 February 1998 Press Release).

### c. *The 3 March 1998 Press Release*

On 3 March 1998, NSL issued a press release (the "3 March 1998 Press Release"), published on *M2 Presswire*, announcing its acquisition of IBS Corporation ("IBS"), a privately held California-based maker of software used by call centers. *Id.* at ¶ 40. As consideration for the acquisition, NSL issued 35,000 ADSs, valued at $1.6 million, and paid an additional $3.9 million in cash. *Id.* In connection with the acquisition of IBS, Levin stated:

> We believe that the acquisition of IBS, following the acquisition of Canadian based Dees Communications in September 1997, will support our ongoing expansion into the fast growing call center market. With IBS's technology, products and customer base, and Nice's CTIL logging and quality measurement solutions, we now have the broadest range of call center logging and quality solutions in the market.

*Id.*

### d. *The 23 April 1998 Press Release*

On 23 April 1998, NSL issued a press release (the "23 April 1998 Press Release"), on *PR Newswire*, concerning the ability of the NiceUniverse System to integrate with the pre-existing systems of its customers. *Id.* at ¶ 42. The 23 April 1998 Press Release indicated NSL had completed the installation of its NiceUniverse quality measurement system at Advanta Mortgage. *Id.* The 23 April 1998 Press Release further stated:

> This installation showcases [NSL's] newest Computer Telephony Integrated [Logging] (CTIL) quality measurement solution, NiceUniverse 3.0, fully integrated with Aspects Automated Call Distributor (ACD).

Advanta, a provider of mortgage and home equity loans, will use the system to monitor its agents to identify agent training requirements and improve agent performance levels in the call center. Integrated with Advanta's Windows 95 network, NiceUniverse allows multiple reviewers to playback [sic] recorded agent transactions and analyze the call center's performance levels using the system's powerful evaluation tools.

\* \* \* \* \* \*

Integration with leading PBX/ACDs is a core component of our business strategy. We are pleased to introduce a truly reliable quality assurance solution tightly integrated with Aspect's ACD.

*Id.*

#### e. *The 6 May 1998 Press Release*

On 6 May 1998, NSL issued a press release (the "6 May 1998 Press Release"), on *PR Newswire,* in which it announced results for the first quarter of 1998. *Id.* at ¶ 45. The 6 May 1998 Press Release indicated net income for the first quarter of 1998 of $4.8 million. *Id.* Commenting upon the performance of NSL in the first quarter of 1998, Levin stated:

The first quarter of 1998 shows that [NSL] continues to benefit from its technological leadership and strong competitive position. In addition to other sectors, we are focusing on the call center market which is expected to grow significantly in the coming years.

*Id.*

#### f. *The 18 May 1998 Press Release*

On 18 May 1998, NSL issued a press release (the "18 May 1998 Press Release"), on *PR Newswire,* announcing that Electric Insurance Company ("EIC") had implemented the quality measurement system of NSL at its Boston-based call center.

*Id.* at ¶ 48. The 18 May 1998 Press Release further stated:

EIC has fully-implemented NiceUniverse 3.0 and integrated the system with its Microsoft Windows–NY network and Lucent PBX. [EIC], with annual sales of over $250 million, is using the system to monitor the quality of service provided by its approximately 150 agents, who provide direct auto, home and boat insurance and related services over the phone.

NiceUniverse 3.0, integrated with Lucent's Definity G3, will provide EIC simultaneous voice recording and screen capture for quality measurement as well as recording·on demand capabilities to verify transactions.

\* \* \* \* \* \*

As a partner in Lucent Technologies' BusinessWorks Alliance Program, we are pleased to have [EIC] represent a showcase site for NiceUniverse 3.0 integrated with Lucent's Definity G3 .... We look forward to long-term customer partnerships, such as the one we have set with [EIC], to provide call center solutions now and in the future.

NiceUniverse is a Windows-compatible CTIL application that automates call center recording and monitoring and assists management in objective evaluation of agent performance. Agent transactions (voice and screen) are digitally stored and easily retrieved using CTIL criteria such as DNIS, ANI and other data. Calls are played back from the workstation of the reviewer who evaluates agents performance using the systems' on-line grading templates and integrated reporting capabilities.

*Id.*

#### g. *The 26 June 1998 Form 20–F*

On or about 26 June 1998, pursuant to the Exchange Act, NSL filed its Form 20–

F with the SEC for the year ending 31 December 1997 (the "1997 Form 20–F"). *Id.* at ¶ 51. The 1997 Form 20–F, which was signed by Arzi, contained the following statements concerning the NiceUniverse System:

NiceUniverse, introduced in February 1998, is a quality measurement solution that automates call center agent monitoring and screen capture. The system provides objective evaluation tools and helps identify training requirements for call center agents. NiceUniverse uses a switch-independent CTIL interface that integrates with ACDs and PC networks. This enables NiceUniverse to monitor and record agent sessions (voice and screen) on a user-defined schedule and store them in compressed digital format. Sessions are later retrieved by the reviewers from their network PCs and agent performance is graded using customized on-screen templates. From these templates and other data, NiceUniverse generates detailed reports, statistics and graphs to help identify training requirements and set relevant benchmarks for call center agents.

\* \* \* \* \* \*

To date the Company has not experienced any significant product returns or requests for repairs.

*Id.*

### h. *The 5 August 1998 Press Release*

On 5 August 1998, NSL issued a press release (the "5 August 1998 Press Release"), on *PR Newswire,* in which it announced results for the second quarter ending 30 June 1998. *Id.* at ¶ 56. Pursuant to the 5 August 1998 Press Release, the net income of NSL for the second quarter of 1998 was $5.1 million. *Id.* Commenting upon the results, Levin stated:

Results for the second quarter reflect our improved position in the call center market. Our strategic decision to focus on call centers in 1998, highlighted by the acquisition of Dees Communications last year and the acquisition of the assets of IBS this quarter, is paying off handsomely. Our leading position in the North American call center market is consistent with Nice's dominance in the financial institutions and the air traffic control markets.

*Id.* (quoting Levin).

### i. *The 17 August 1998 Press Release*

On 17 August 1998, NSL issued a press release (the "17 August 1998 Press Release"), on *PR Newswire,* promoting the ability of the System to integrate with the pre-existing systems of its customers. *Id.* at ¶ 59. The 17 August 1998 Press Release contained excerpts of an interview given by Levin to a *Bloomberg* reporter. The quote from Levin read as follows:

The call center market is an immense and growing business sector worldwide. It generates high margins and has the potential for increasing our revenues significantly by the turn of the century . . . .

*Id.*

### j. *The 8 September 1998 Press Release*

On 8 September 1998, NSL issued a press release (the "8 September 1998 Press Release"), on *PR Newswire,* announcing the launch of its Professional Services Division. *Id.* at ¶ 61. In connection with this announcement, Sturdy stated:

In today's competitive call center environment, customer-service oriented companies are looking for more than just great technology when improving their operations. Our suite of value-added professional services provides customers [with] a comprehensive program that encompasses implementation, technical

training and call center consultative services that go beyond the technology. *Id.*

### 2. *Scienter Allegations*

Lead Plaintiffs allege Defendants acted with scienter in that they were provided with, and were privy to, non-public adverse information concerning both NSL in general and the System in particular. *Id.* at ¶ 72. Specifically, Lead Plaintiffs allege Defendants knew that (1) the public documents and statements complained of in the Second Amended Complaint were materially false and misleading, (2) such statements and documents would be issued or disseminated to the investing public and (3) Defendants substantially participated or acquiesced in the issuance of such statements and documents. *Id.*

Lead Plaintiffs also allege that, given the importance of the System to the overall performance of NSL, Defendants "must have been aware" of the "serious adverse facts" regarding the System. *Id.* at ¶ 73. Lead Plaintiffs further assert that Defendants must have been aware of System problems because the System was being tested both before and during the Class Period. *Id.* at ¶ 74.

According to Lead Plaintiffs, the timing of the statements promoting the System, as well as the "ultimate revelation that sales of the System were being halted," indicate that Defendants were aware of the "falsity of their statements." *Id.* at ¶ 76. Lead Plaintiffs contend that Defendants issued "unequivocally positive statements" pertaining to the System less than eight weeks before the 24 September 1998 Press Release announcing the System needed modification. *Id.*

Lead Plaintiffs further allege Defendants were motivated to misrepresent and conceal problems with the System in order to secure market share in the "highly competitive call center market." *Id.* at ¶ 77. Moreover, Lead Plaintiffs assert that the alleged wrongdoing permitted Defendants to use "artificially inflated securities" as consideration for the March 1998 acquisition of IBS. *Id.*[9]

### *Discussion*

#### A. *Standard for Dismissal Under Rule 12(b)(6)*

A complaint may be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") for failure to state a claim where it appears beyond doubt no relief could be granted under any set of facts which could be proved consistent with the allegations. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Hishon v. King & Spalding*, 467

---

9. Lead Plaintiffs contend that the statutory safe harbor provided for certain forward-looking statements does not apply in this instance. Second Amended Complaint at ¶ 80. Lead Plaintiffs also contend that many of the statements identified in the Second Amended Complaint were not identified as "forward-looking statements" when made. *Id.* Lead Plaintiffs allege, moreover, that to the extent any of the statements were forward-looking, they were not accompanied by any "meaningful cautionary statements." *Id.* Additionally, the forward-looking statements did not identify "important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements." *Id.*

In the alternative, Lead Plaintiffs allege that if the statutory safe harbor does apply, Defendants are liable for false forward-looking statements because "at the time each of those forward-looking statements was made, the ... speaker knew that the particular forward-looking statement was false ...." *Id.* Lead Plaintiffs also contend that any forward-looking statements were authorized and, or, approved by an executive officer of NSL who knew the statement was false when made. *Id.*

U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir.2000) (citations omitted); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397–98 (3d Cir.2000).

All allegations set forth by a plaintiff are taken as true and all reasonable factual inferences are drawn in his or her favor. *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 475, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Semerenko*, 223 F.3d at 173; *Port Authority of N.Y. and NJ v. Arcadian Corp.*, 189 F.3d 305, 311 (3d Cir.1999); *Consolidated Rail Corp. v. Portlight, Inc.*, 188 F.3d 93, 94 (3d Cir. 1999); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir.1997); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997).

A complaint may not be dismissed unless it appears beyond doubt "the facts alleged in the complaint, even if true, fail to support the claim." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d at 397–99; *Trump Hotels and Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir.1998). Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir.1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss"); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F.Supp.2d 318, 325 (D.N.J.1999); *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 922 (D.N.J.1998).

A District Court reviewing the sufficiency of a complaint has a limited role. The issue is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir.2000); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997); *Syncsort Inc.*, 50 F.Supp.2d at 325; *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d at 922. Generally, when conducting such an inquiry, a District Court may not consider any material beyond the pleadings. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993); *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d at 922.

A District Court may properly refer, however, to the factual allegations contained in other documents, such as documents referred to in the complaint and matters of public record, if the claims of the plaintiff are based upon those documents. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 707 (3d Cir.1996); *In re Donald Trump Sec. Litig.*, 7 F.3d 357, 368 n. 9 (3d Cir.1993); *Pension Benefit Guar. Corp.*, 998 F.2d at 1196; *Gannon v. Continental Ins. Co.*, 920 F.Supp. 566, 574 (D.N.J.1996). In other words, such documents must be "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (citation and internal quotations omitted). The reason for this rule is to prevent

> [t]he situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. Under these circumstances, reference to documents outside of the complaint does not convert a motion to

dismiss into a motion for summary judgment. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426; *Pension Benefit Guar. Corp.,* 998 F.2d at 1196–97.

### B. *The Exchange Act*

■ In general, the Exchange Act regulates post-distribution trading. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 171, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 752, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). The Exchange Act embraces a "fundamental purpose ... [of] substitut[ing] a philosophy of full disclosure for the philosophy of caveat emptor." *Id.* (quoting *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972))(internal quotation marks omitted). The Exchange Act is part of a detailed scheme of civil liability. *Central Bank of Denver,* 511 U.S. at 171, 114 S.Ct. 1439.

#### 1. *Section 10(b) and Rule 10b–5*

Count One of the Second Amended Complaint alleges violations of Section 10(b) and Rule 10b–5. Second Amended Complaint at ¶¶ 87–97. Through Section 10(b), Congress prohibited manipulative or deceptive acts in connection with the purchase or sale of securities. 15 U.S.C. § 78j. Rule 10b–5, adopted by the SEC in 1942, similarly outlawed such fraudulent conduct in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b–5.

■ To establish a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead

(1) that the defendant made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with knowledge or recklessness and (5) that the plaintiff reasonably relied on

the misrepresentation or omission and (6) consequently suffered damage.

*In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 537 (3d Cir.1999) (citing *In re Westinghouse Sec. Litig.,* 90 F.3d at 710); *see also In re Rockefeller Ctr. Properties, Inc. Sec. Litig.,* 184 F.3d 280, 290, n. 14 (3d Cir.1999); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 135 F.3d 266, 269 (3d Cir.1998); *Kline v. First Western Government Sec., Inc.,* 24 F.3d 480, 487 (3d Cir.1994).

#### 2. *Rule 9(b)*

■ Because a Rule 10b–5 claim is a "fraud" claim, Lead Plaintiffs must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"). *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1417; *In re Westinghouse Sec. Litig.,* 90 F.3d at 710; *Wallace v. Systems & Computer Tech. Corp.,* No. 95–6303, 1997 WL 602808, at *8 (E.D.Pa. Sept. 23, 1997). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The purpose of the heightened pleading requirement is to give defendants "notice of the claims against them, [to] provide an increased measure of protection for their reputations, and [to] reduce the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1418.

■ In order to satisfy Rule 9(b) in connection with a Rule 10b–5 claim, a plaintiff must plead with particularity (1) a specific misrepresentation of material fact, (2) the knowledge by defendants of its falsity, (3) the ignorance by the plaintiff of its falsity, (4) the intention of defendants that it should be acted upon and (5) that plaintiff acted upon it to his detriment. *In re Westinghouse Sec. Litig.,* 90 F.3d at

710; *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 284 (3d Cir.1992).

Consequently, Rule 9(b) demands increased specificity in the pleadings to establish violations of Section 10(b) and Rule 10b–5. Pursuant to Rule 9(b), allegations concerning misrepresentations of material fact must be pleaded in greater detail. *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999); *see e.g. In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1417–18 (pursuant to Rule 9(b), "where plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, ... plaintiffs [must] state what the unreasonable practices were and how they distorted the disclosed data"); *Shapiro*, 964 F.2d at 285 (citing *In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 646 (3d Cir.1989)) (Rule 9(b) requires plaintiffs to "accompany the allegations with a statement of fact upon which their allegation is based").

▉ The particularity requirement of Rule 9(b) is "relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *Shapiro*, 964 F.2d at 285; *In re Craftmatic Sec. Litig.*, 890 F.2d at 645. This is so because application of the particularity requirement "may permit sophisticated defrauders to successfully conceal the details of their fraud." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *see also In re Craftmatic Sec. Litig.*, 890 F.2d at 645; *Christidis v. First Pa. Mort. Trust*, 717 F.2d 96, 100 (3d Cir. 1983).

▉ Even under a relaxed application of Rule 9(b), "boilerplate and conclusory allegations will not suffice." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *Shapiro*, 964 F.2d at 285. Instead, "[p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *Stevelman*, 174 F.3d at 84; *Shapiro*, 964 F.2d at 285; *In re Craftmatic Sec. Litig.*, 890 F.2d at 645.

### 3. The Private Securities Litigation Reform Act

Complaints alleging securities fraud must also comply with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). 15 U.S.C. 78u–4 *et seq.; Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir.2000); *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 530; *In re Cendant Corp. Litig.*, 60 F.Supp.2d 354, 368–69 (D.N.J.1999). Congress enacted the PSLRA in an effort to curb abuse in private securities litigation, especially the filing of so-called "strike suits." S.Rep. No. 104–98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683; *In re Aetna Inc. Sec. Litig.*, No. MDL–1219, 1999 WL 354527, at *4 (E.D.Pa. May 26, 1999). The Committee on Banking, Housing and Urban Affairs reported that:

> The Committee heard substantial testimony that today certain lawyers file frivolous "strike" suits alleging violations of Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation. These suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on nothing more than a company's announcement of bad news, not evidence of fraud. All too often, the same "professional" plaintiffs appear as name plaintiffs in suit after suit.

S.Rep. No. 104–98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683.

The PSLRA seeks to "curtail the filing of abusive lawsuits" through the establishment of a "uniform and stringent pleading

requirement." *Id.* at 15, reprinted 1995 U.S.C.C.A.N. at 694. To that end, the PSLRA requires a complaint, which asserts a Section 10(b) claim, set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint *shall state with particularity all facts on which that belief is formed.*" 15 U.S.C. § 78u–4(b)(1) (emphasis added).

In addition, to allege scienter sufficiently, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *Oran*, 226 F.3d at 288. A complaint that fails to meet these "stringent" pleading requirements, must be dismissed. 15 U.S.C. 78u–4(b)(3)(A).[10]

Defendants argue the Section 10(b) claim of Lead Plaintiffs fails to meet the pleading requirements of both the PSLRA and Rule 9(b). Moving Brief at 11–18.

a. *15 U.S.C. § 78u–4(b)(1)*

i. *Failure to Plead the Source of Information and Belief*

The PSLRA mandates that "if an allegation regarding [a] statement or omission is made on information and belief, the complaint *shall state with particularity all facts* on which that belief is formed." 15 U.S.C. § 78u–4(b)(1) (emphasis added). In so drafting the PSLRA, "Congress intended to assure that the requirements of Rule 9(b) were met in all securities fraud cases, including those pled on information and belief." *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746, 752 (N.D.Cal. 1997) (citing H.R. Conf. Rep. No. 104–369, at 41, reprinted in 1995 U.S.C.C.A.N. 730, 740).

■ In an apparent attempt to avoid this clear mandate, Lead Plaintiffs carefully avoid using the words "information and belief" and instead assert that the allegations in the Complaint are based upon the investigation of counsel. Second Amended Complaint, Preamble. Allegations made on the basis of the investigation of counsel, however, are the functional equivalent of allegations made upon information and belief.[11] *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir.1999); *In re Theragenics Corp. Sec. Litig.*, 105 F.Supp.2d 1342, 1351 (N.D.Ga.2000); *In re PETsMART, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 989 (D.Ariz.1999); *In re Green Tree Corp. Sec. Litig.*, 180 F.3d at 535; *In re Cendant*, 60 F.Supp.2d at 375.

---

**10.** Pursuant to the PSLRA, certain forward-looking statements qualify for safe harbor treatment and are protected from Section 10(b) and Rule 10b–5 liability. 15 U.S.C. § 78u–5. A "statement is forward-looking if, *inter alia*, it is 'a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.' " *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 535 (quoting 15 U.S.C. § 78u–5(i)(1)(A)).

A forward-looking statement will not qualify for safe harbor treatment if the plaintiff alleges the statement was made with "actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B)(i); *see also In re Advanta*

**11.** Rule 11(b) of the Federal Rules of Civil Procedure requires that allegations in a complaint be based upon either personal knowledge or information and belief. Fed. R.Civ.P. 11(b); *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 166 (2d Cir.1999). Because the investigation of counsel does not confer personal knowledge on Lead Plaintiffs, the allegations are necessarily based upon information and belief. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir.1999); *In re Aetna, Inc. Sec. Litig.*, 34 F.Supp.2d 935, 942 (E.D.Pa.1999).

*Financial Corp. Stock Litig.,* 61 F.Supp.2d 860, 872 (D.Minn.1999); *In re Aetna Inc. Sec. Litig.,* 34 F.Supp.2d at 942. Because Lead Plaintiffs are pleading upon information and belief, the PSLRA requires that Lead Plaintiffs particularize all facts upon which their belief was formed, including the identities of unnamed "former employees." 15 U.S.C. § 78u–4(b)(1). This they have failed to do.

■ The language of a statute is the starting point when considering its meaning. *U.S. v. Gregg,* 226 F.3d 253, 257 (3d Cir.2000); *Williams v. Taylor,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000); *Richardson v. U.S.,* 526 U.S. 813, 818, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). "Where the statutory language is plain and unambiguous, further inquiry is not required, except in the extraordinary case where a literal reading of the language produces an absurd result." *Idahoan Fresh v. Advantage Produce, Inc.,* 157 F.3d 197, 202 (3d Cir.1998); *see also U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (Where "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' ") (quoting *Caminetti v. U.S.,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). Therefore, "if the statutory language is clear, a court must give [such language] effect unless this 'will produce a result demonstrably at odds with the intention of [the] drafters.' " *Government of the Virgin Islands v. Knight,* 989 F.2d 619, 633 (3d Cir.1993) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)); *see also Williams,* 529 U.S. at 431, 120 S.Ct. 1479 ("We give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.") (citation and internal quotations omitted);

*Gregg,* 226 F.3d at 257 ("Once the plain meaning of the statute is determined, it is conclusive except in rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of the drafters.") (citation and internal quotations omitted).

■ When construing the language of a statute, "significance and effect" must be accorded "to every word." *Rake v. Wade,* 508 U.S. 464, 471, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993) (citations omitted); *see also Public Lands Council v. Babbitt,* 529 U.S. 728, 746, 120 S.Ct. 1815, 1826, 146 L.Ed.2d 753 (2000) (a statute must "be construed in such a fashion that every word has some operative effect.") (quoting *U.S. v. Nordic Village, Inc.,* 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)); *In re Top Grade Sausage, Inc.,* 227 F.3d 123, 129 (3d Cir.2000) ("[C]ourts are obliged to give effect, if possible, to every word Congress used.") (quoting *In re Cohn,* 54 F.3d 1108, 1115 (3d Cir.1995)). Accordingly, a court, when interpreting a statute, may not simply read words out of the statute. *See e.g. National Credit Union Admin. v. First National Bank & Trust Co.,* 522 U.S. 479, 502, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *Morales v. Trans World Airlines,* 504 U.S. 374, 385, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

The plain language of the PSLRA indicates that a plaintiff may not plead some facts and withhold others. As mentioned, a complaint on information and belief "shall state with particularity *all facts* on which that belief is formed." 15 U.S.C. § 78u–4(b)(1) (emphasis added). Although the words "all" and "facts" are not defined in the PSLRA, the meaning of each is plain. "All" means "every member or individual component of." Black's Law Dictionary 74 (6th ed.1990). "Fact" is defined as

"an event or circumstance." [12] *Id.* at 591. The plain language of the PSLRA dictates that plaintiffs pleading on information and belief set forth each and every event or circumstance upon which their claims are based. *see Immigration and Naturalization Service v. Elias–Zacarias*, 502 U.S. 478, 482, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) ("In construing statutes, we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.") (citation and internal quotations omitted).

As discussed, moreover, "only the most extraordinary showing of contrary intentions from [legislative history] would justify a limitation on the 'plain meaning' of the statutory language." *Ries v. National Railroad Passenger Corp.*, 960 F.2d 1156, 1161 (3d Cir.1992) (quoting *Garcia v. U.S.*, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)). While neither necessary nor appropriate for consideration in the present matter, the plain language of the PSLRA is reinforced by the legislative history of the statute.

In H.R. Conf. Rep. No. 104–369, Congress stated that its intent in promulgating the information and belief provision was to require that a "plaintiff ... state with particularity *all* facts in the plaintiff's possession on which the belief is formed." H.R. Conf. Rep. No. 104–369, at 41, reprinted in 1995 U.S.C.C.A.N. at 740 (emphasis added). As the Supreme Court has commented, a conference report such as the one issued in connection with the passage of the PSLRA is "traditionally [an] authoritative indicator[ ] of legislative intent." *Northeast Bancorp, Inc. v. Board of Governors of Federal Reserve System*, 472 U.S. 159, 170, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985); *see also Garcia*, 469

U.S. at 76, 105 S.Ct. 479 ("[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'") (quoting *Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)).

Additional legislative history regarding information and belief allegations comes from consideration of an amendment to H.R. 1058 (the version of the PSLRA from the House of Representatives), proposed by Congressman John Bryant, D–TX (the "Bryant Amendment"). Arguing against the requirement that plaintiffs state with particularity all facts on which their beliefs are formed, Representative Bryant expressed concern that

> at the beginning of the case plaintiff would have to set forth "with specificity all information," they have to give all the information in advance that forms the basis for the allegations of the plaintiff, meaning any whistle-blower within a securities firm involved would have to be uncovered in the pleadings in the very, very beginning.

141 Cong. Rec. H2848 (8 March 1995). Congressman John Dingell, D–MI, agreed and stated that H.R. 1058, if passed without the Bryant Amendment, would require plaintiffs "literally, in [their] pleadings, [to] include the names of confidential informants, employees, competitors, and others who have provided information leading to the filing of the case." 141 Cong. Rec. H2849 (8 March 1995). Despite such concerns, Congress rejected the Bryant Amendment. 141 Cong. Rec. H2848 (8 March 1995).

---

**12.** "Facts" also include the names of confidential informants, employees, competitors and others who provide information which leads to the filing of a complaint under the Exchange Act. 141 Cong. Rec. H2849 (8 March 1995).

In *In re Silicon Graphics, Inc. Sec. Litig.*, the District Court concluded that "because 'Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language,' ... plaintiffs must plead the sort of information described by Reps. Bryant and Dingell to meet the requirements of the [PSLRA] as enacted." 970 F.Supp. at 764 (quoting *Immigration & Naturalization Service v. Cardoza–Fonseca*, 480 U.S. 421, 442–43, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). Moreover, in affirming the District Court in *In re Silicon Graphics, Inc. Sec. Litig.*, the Ninth Circuit held that the "all facts" requirement for complaints pled on information and belief cannot be satisfied if plaintiffs fail to identify the sources upon which their belief is based. 183 F.3d at 984.

■ According to the Ninth Circuit, "[i]t is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate [the plaintiff's] claim." *Id.* at 985; *see also In re Aetna Inc. Sec. Litig.*, 34 F.Supp.2d at 942–43 (adopting the District Court's analysis in *In re Silicon Graphics, Inc. Sec. Litig.* and holding that "plaintiffs must state with particularity the sources of the facts that they allege on information and belief."); *In re Aetna, Inc. Sec. Litig.*, 1999 WL 354527, at *4 ("[T]he disclosure of the names and addresses of persons interviewed by Plaintiffs' counsel is consistent with the policy considerations underlying the [PSLRA].").

The Second Circuit, nevertheless, recently held that "plaintiffs who rely on confidential sources are not always required to name those sources, even when they make allegations on information and belief." *Novak v. Kasaks*, 216 F.3d at 313. In arriving at such a conclusion, the Second Circuit attempted to explain away the requirement that allegations on information and belief must be accompanied by a statement of "all facts on which that belief is formed." *Id.*

First, that Circuit stated that the identity of a confidential source is not a "fact." *Id.* According to the Second Circuit, "the applicable provision of the law as ultimately enacted requires plaintiffs to plead only facts and makes no mention of the sources of these facts." *Id.* The Second Circuit, nevertheless, failed to set forth any reasoning to support its conclusion that a source, including confidential informants, employees, competitors and others who provide information, is not a "fact." *Id.* Absent any support for such a proposition, it is difficult to perceive how a source does not constitute a "fact," especially in light of the rejection of the Bryant Amendment and the comments of Congressmen Bryant and Dingell. *See* pp. 35–37 *supra; see also Williams*, 529 U.S. at 431, 120 S.Ct. 1479. (the words of a statute are given their "ordinary, contemporary, [and] common meaning.").

Second, the Circuit, inexplicably read the word "all" out of the statute. *Id.* at 314 n. 1. According to the Second Circuit, "[r]eading 'all' literally would produce illogical results that Congress cannot have intended." *Id.* Such a finding, however, appears to violate a basic tenet of statutory construction. As discussed, a statute must "be construed in such a fashion that *every word* has some operative effect." *Public Lands Council*, 529 U.S. at 746, 120 S.Ct. at 1826 (quoting *Nordic Village*, 503 U.S. at 36, 112 S.Ct. 1011) (emphasis added).[13] The holding of the Second Circuit in

---

13. Further indication that Congress intended to give the word "all" meaning stems

from the fact that Congress included the word "all" in 15 U.S.C. § 78u–4(b)(1) but

*Novak,* therefore, appears to contradict the plain language of the PSLRA.[14]

In the instant matter, Lead Plaintiffs reference the following sources in the Second Amended Complaint:

- "several former NSL employees, including persons who previously were employed by Dees, who were privy to information and discussions about the relevant facts," Second Amended Complaint at ¶ 31;

- "a former NSL employee who has personal knowledge of the Company's testing procedures for its CTIL products," *id.* at ¶ 33;

- "former NSL employees with personal knowledge of the pertinent facts," *id.* at ¶ 34;

- "a former employee of the Canadian Imperial Bank of Commerce ("CIBC")," *id.* at ¶ 35;

- "a former CIBC employee with personal knowledge of the relevant facts," *id.* at ¶ 43;

- "an Advanta employee who was privy to information and discussions about the relevant facts," *id.* at ¶ 44;

- "an EIC employee," *id.* at ¶ 50; and

- "an employee of ... Safilo USA," *id.* at ¶ 53.

Although afforded every opportunity to do so, Lead Plaintiffs do not identify any source by name.[15] Moreover, Lead Plaintiffs simply identify the above-mentioned sources as "employees" or "former employees," with no mention of the positions they held within their respective organizations. *See In re Splash Technology Holdings, Inc. Sec. Litig.,* No. C 99–00109, 2000 WL 1727377, at *12 (N.D.Cal. Sept. 29, 2000) (in a complaint pled on information and belief, "failing to allege the sources of the plaintiff's information ... is not adequate."); *Berger v. Ludwick,* Nos. C–97–0728–CAL, C–97–2347–CAL, 2000 WL 1262646, at *5 (N.D.Cal. Aug. 17, 2000) (finding that plaintiffs did not satisfy the particularity requirement where plaintiffs' "summary assertions" were based, in part, on the statements of unnamed former employees).[16] Even under the Second Cir-

---

not in 15 U.S.C. § 78u–4(b)(2). *Compare* 15 U.S.C. § 78u–4(b)(1) ("the complaint shall state with particularity all facts") *with* 15 U.S.C. § 78u–4(b)(2) ("the complaint shall ... state with particularity facts").

14. Although the Second Circuit held that "plaintiffs who rely on confidential sources are not always required to name those sources," the court stated that plaintiffs must still "describe[] [the sources] in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak,* 216 F.3d at 313–14.

15. As will be discussed *infra,* pursuant to the PSLRA, Lead Plaintiffs must present a "strong inference" of scienter. 15 U.S.C. § 78u–4(b)(2); *Oran,* 226 F.3d at 288. "'A mere reasonable inference is insufficient to survive a motion to dismiss.'" *Fitzer v. Security Dynamics Technologies, Inc.,* 119

F.Supp.2d 12, 24 (D.Mass.2000) (quoting *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 195 (1st Cir.1999)). "Unnamed employees simply cannot ... establish a strong inference of scienter with respect to management." *Fitzer,* 119 F.Supp.2d at 24–25. While it may be plausible that if former NSL employees knew of problems with the System, management may also have been aware of such problems, "plausibility is not the standard here—[Lead Plaintiffs] must present facts that give rise to a strong inference of scienter." *Id.* at 25.

16. Under the present set of facts, there does not appear to be any public policy reason for not disclosing the names of former employees at the pleading stage. Indeed, counsel for Lead Plaintiffs admitted at oral argument that if the instant Motion to Dismiss were denied and discovery were to go forward, Lead Plaintiffs would be required to identify the unnamed former employees:

cuit standard enunciated in *Novak*, Lead Plaintiffs have not "described [the sources] in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. In sum, Lead Plaintiffs have not complied with the particularity requirements of the PSLRA. They have not even alleged sufficient information about their sources to "inject precision and some measure of substantiation into their allegations of fraud." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir.1998).

### ii. *Specific Facts Must Be Alleged In Support of Fraud Allegations*

Defendants argue the Second Amended Complaint fails to plead with particularity facts which support the fraud allegations. Moving Brief at 15. Lead Plaintiffs contend Defendants intentionally failed to disclose negative information about the System, thereby rendering their positive statements misleading. Opposition Brief

at 12–13. Lead Plaintiffs further argue Defendants made "specific representations that were outright falsehoods." *Id.*

 A statement is false or misleading "if it is factually inaccurate, or additional information is required to clarify it." *Wallace*, 1997 WL 602808, at *9; *In re Bell Atlantic Corp. Sec. Litig.*, No. CIV. A. 91–0514, 1997 WL 205709, at *23 (E.D.Pa. April 17, 1997); *Pache v. Wallace*, No. 93–5164, 1995 WL 118457, at *3 (E.D.Pa. Mar. 20, 1995), *aff'd*, 72 F.3d 123 (3d Cir.1995).

 In order to determine whether a forward-looking statement may be deemed false or misleading, "the court must examine whether the speaker, at the time it [was] made, (1) actually believed the statement to be accurate, or whether (2) there is a factual or historical basis for that belief." *In re Bell Atlantic Corp. Sec. Litig.*, 1997 WL 205709, at *23 (citing *Kline*, 24 F.3d at 486). It is not enough, however, that a statement is false or misleading; if the misrepresented fact is not material, then the misrepresented fact is

COURT: Are you telling me if I bought into your argument and they served an interrogatory to identify these people, you wouldn't have to identify them?

\* \* \* \* \* \*

WEISS: We might have arguments about work product, but—

\* \* \* \* \* \*

COURT: Are you telling me that the names of these people who supplied facts to you on which you supposedly rely under Rule 11 would be work product?

\* \* \* \* \* \*

WEISS: Simply disclosing names of individuals with the information I believe would not be work product. We would disclose that information.

\* \* \* \* \* \*

COURT: [The unnamed former employees] can be forced with payment of only a witness fee to show up for a deposition, can't they?

WEISS: Yes, you Honor.

COURT: They all have to answer questions, don't they?

WEISS: Yes, your Honor.

COURT: None of them can withhold information, can they?

WEISS: Other then on the grounds of some kind of privilege.

COURT: What privileges are we talking about, Fifth Amendment?

WEISS: No, I don't necessarily see a privilege, but there may be something we don't see.

\* \* \* \* \* \*

COURT: How could they withhold any of the data that they're aware of?

WEISS: At a proper deposition, subject to subpoena, I think your Honor is correct, they would have to answer questions, but we're *simply not in discovery at this point*, we're at the pleading stage.

COURT: That's a distinction without a difference.

20 December 2000 Oral Argument, Tr. at 13:21–17:15.

not actionable. *Basic Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Weiner,* 129 F.3d at 317.

▪ A misleading statement or omission is material if there is a substantial likelihood that a reasonable investor would have viewed the statement or omission "as having significantly altered the 'total mix' of information made available." *Basic,* 485 U.S. at 231, 108 S.Ct. 978; *Oran,* 226 F.3d at 282 ("Material information is 'information that would be important to a reasonable investor in making his or her investment decision.'") (internal citation omitted); *Weiner,* 129 F.3d at 317 ("Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact.") (citing *Shapiro,* 964 F.2d at 281 n. 11).

Each allegation of fraud asserted by Lead Plaintiffs must be considered separately. *In re Westinghouse,* 90 F.3d at 712 (fraud allegations should be analyzed individually to determine whether each alleged incident of fraud has been pleaded with particularity); *Shapiro,* 964 F.2d at 284 (directing plaintiff to amend complaint and stating "plaintiff should rearrange the existing allegations into discrete units that are, standing alone, each capable of evaluation under the [relevant] legal principles").

a) *The 4 February 1998 Press Release*

The Class Period commenced with the 4 February 1998 Press Release introducing the NSL System. Second Amended Complaint at ¶ 30. NSL announced that the System supported the leading industry switches including Nortel, Lucent and Aspect. *Id.* The 4 February 1998 Press Release also included a statement attributed to Sturdy that "[o]ur *goal* is to offer … systems that are easily integrated with …

existing computer network and telecom environments." *Id.* (emphasis added).

Lead Plaintiffs allege that, according to "former employees" of NSL and Dees "privy to information and discussions about the relevant facts," by February 1998 it was apparent the System only supported the Nortel switch. *Id.* at ¶ 31. Lead Plaintiffs further allege NSL could not install the System using a Lucent switch in March 1998 without "first installing a totally independent program called 'Passageway.'" *Id.* at ¶ 32. Lead Plaintiffs allege that "former NSL employees" claimed "it was apparent by at least as early as the beginning of February 1998 that the System … was not 'easily integrated' with … existing systems." *Id.* at ¶ 31. Lead Plaintiffs also claim NSL had not completed "a second round of testing" using the Aspect switch with the System. *Id.* at ¶ 32.

Defendants assert that Lead Plaintiffs fail to allege the System did not function with the Lucent switch. Moving Brief at 18. Defendants argue that Lead Plaintiffs discuss the testing process rather than the System's ability to function with the Aspect switch. Moving Brief at 18.

▪ It is unclear based on the stated facts whether the alleged System problems were "apparent" to NSL management "as early as the beginning of February" or just to "a former NSL employee with knowledge of NSL testing procedures." Second Amended Complaint at ¶ 32. The fact that the System supported the Lucent switch using a software patch and that a "second round of testing" had not been done on the Aspect switch does not appear sufficient to support an allegation that the 4 February 1998 Press Release was false or misleading when issued. *See Oran,* 226 F.3d at 282.

Moreover, a relevant portion of the 4 February 1998 Press Release states that it is "[NSL's] *goal* is to offer … systems that are easily integrated with … existing computer network and telecom environments," Second Amended Complaint at ¶ 30 (emphasis added). This is simply an aspiration, a statement of optimism; it is non-actionable "puffery." *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 538; *see also* pp. 60–63, *infra.*

With regard to the 4 February 1998 Press Release, Lead Plaintiffs provide no more than simple assertions and legal conclusions which are insufficient to satisfy the pleading requirements of Rule 9(b) and the PSLRA. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1417; *In re Westinghouse Sec. Litig.*, 90 F.3d at 710.

b) *The 3 March 1998 Press Release*

In the 3 March 1998 Press Release, NSL announced the acquisition of IBS, a company in the business of making software used by call centers. Second Amended Complaint at ¶ 40. The 3 March 1998 Press Release made several positive statements about the IBS acquisition and its potential benefits for NSL. *Id.* Specifically, Levin stated: "We believe that the acquisition of IBS, … will support our ongoing expansion into the fast growing call center market." *Id.* Levin also stated: "With IBS'S technology, system and customer base, and Nice's CTI[L] and quality measurement solutions, we now have the broadest range of call center logging and quality solutions on the market." *Id.*

Lead Plaintiffs maintain that "statements concerning the breadth and success of the Company's call center solutions were deceptive in light of the serious problems affecting the [System]." *Id.* at ¶ 41. Defendants, however, contend that the 3 March 1998 Press Release represented

mere corporate puffery. Moving Brief at 30.

█ The statement "[w]e believe that the acquisition of IBS … will support our ongoing expansion into the fast growing call center market" is not a general, non-specific statement. *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d at 928 ("The statement 'MobileMedia believes the MobileComm acquisition will enhance its competitive position' … draws a link between future success and the acquisition of MobileComm. This is not inactionable puffery."); *see also e.g. Weiner*, 129 F.3d at 320 (statement that corporation was confident of achieving at least 7% real earning growth was not the type of vague expression of optimism that has been found to be immaterial). If as Lead Plaintiffs allege, NSL had no reasonable basis for this belief given the problems it was experiencing with the System, this statement may serve as the basis for liability. *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d at 928.

Lead Plaintiffs, however, fail to allege how this statement was false on 3 March 1998. Second Amended Complaint at ¶ 40. The announcement involved the acquisition of IBS, a company in the business of making software used by call centers. *Id.* at ¶ 40. According to the 3 March 1998 Press Release, the acquisition was intend to bring new technology and a new customer base into NSL. *Id.* Lead Plaintiffs make a conclusory allegation that the statement was deceptive because the System had problems. *Id.* at ¶ 41. "[M]isguided optimism, [however,] is not a cause of action …[,] nothing alleged indicates that management was promoting a fraud. People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future." *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 42 (2d Cir.2000).

The statements in the 3 March 1998 Press Release reported changed corporate circumstances flowing from the IBS acquisition. *Id.* When viewed in the "context in which the alleged misrepresentations were made," the statement by Levin is not actionable. *See In re Donald Trump Casino Sec. Litig.*, 7 F.3d at 364. The factual allegations do not support an inference that on the eve of the IBS acquisition, Defendants believed anything other than "the acquisition of IBS ... w[ould] support [NSL's] ongoing expansion into the fast growing call center market." Second Amended Complaint at ¶ 40.

### c) *The 23 April 1998 Press Release*

█ On 23 April 1998, NSL issued a press release announcing the installation of the System at Advanta Mortgage ("Advanta"). *Id.* at ¶ 42. The 23 April 1998 Press Release stated, in pertinent part:

This installation showcases Nice's newest Computer Telephony Integrated (CTI[L]) quality measurement solution, NiceUniverse 3.0, fully integrated with Aspect's Automated Call Distributor (ACD).

*Id.* Lead Plaintiffs allege that the above statement, in conjunction with a comment by Sturdy that "[w]e are pleased to introduce a truly reliable quality assurance solution tightly integrated with Aspect's ACD," was fraudulent and made with conscious disregard for the truth. *Id.*

It appears the 23 April 1998 Press Release offered concrete factual statements about the performance of a technical product. *Id.* Statements such as "fully integrated with," "truly reliable ... solution," and "tightly integrated with," are the type of statements that a reasonable investor would consider as significantly altering the "total mix of information made available." *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 538 (citing *TSC Indus., Inc. v. North-*

*way*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

Lead Plaintiffs allege that in April 1998, several CIBC employees visited Advanta and saw only a few dozen simulated calls on the System. *Id.* at 43. According to Lead Plaintiffs, NSL did not demonstrate that the System "was fully integrated with Aspect's ACD and was fully operational." *Id.*

Lead Plaintiffs, however, do not allege sufficient facts to suggest Defendants knew the System was not "truly reliable" or "tightly integrated" with the Advanta call center on 23 April 1998. *Id.* Lead Plaintiffs do not reveal when in April the CIBA employees visited Advanta. *Id.* The Second Amended Complaint, moreover, fails to indicate whether the "few dozen simulated calls" actually worked. *Id.* Additionally, Lead Plaintiffs do not indicate whether NSL represented to CIBA they would demonstrate more than a "few dozen simulated calls." *Id.*

Lead Plaintiffs also allege Advanta was dissatisfied with the System and purchased a different product from an NSL competitor. *Id.* Lead Plaintiffs, however, do not indicate when Advanta experienced problems with the System, when, or if, Advanta notified NSL of the problems and when Advanta purchased the substitute product. *Id.* at ¶ 44.

In order to satisfy Rule 9(b) in connection with a Rule 10b–5 claim, Lead Plaintiffs must show, *inter alia,* a misrepresentation of material fact and knowledge by the Defendants of its falsity. *In re Westinghouse Sec. Litig.*, 90 F.3d at 710. The facts and circumstances, as alleged, do not provide enough specificity to determine whether the 23 April 1998 Press Release was false when issued. Second Amended Complaint at ¶ 43. Nor are the facts, as alleged, sufficient to form the basis for a

belief that NSL knew the statement was false when made. *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d at 39.

### d) *The 18 May 1998 Press Release*

The 18 May 1998 Press Release announced the implementation of the System at Electric Insurance Company ("EIC"). Second Amended Complaint at ¶ 48. Lead Plaintiffs contend that several comments in the 18 May 1998 Press Release were misleading or false. *Id.* Relevant portions of the 18 May 1998 Press Release stated:

EIC has fully-implemented [the System] and integrated the system with its Microsoft Windows–NT network and Lucent PBX .... [the System], integrated with Lucent's Definity G3, will provide EIC simultaneous voice recording and screen capture for quality measurement as well as recording on demand capabilities to verify transactions.

*Id.* Lead Plaintiffs allege these statements were false and misleading in light of underlying System problems. *Id.* at ¶¶ 31–36, 44, 49. Lead Plaintiffs also allege the 18 May 1998 Press Release was deceptive because "the System's tendency to cause corruption and loss of data created significant problems for EIC." *Id.* at ¶ 50. In support of this allegation, Lead Plaintiffs allege that an unnamed EIC employee reported: "The [System] caused EIC to lose access to data on a number of occasions beginning in or about May 1998, including, at least one occasion when EIC lost access permanently to about two months of telephone calls and other data that had been recorded." *Id.* at ¶ 50.

Under Rule 9(b), "plaintiffs must plead with particularity the 'circumstances' of the alleged fraud. They need not, however, plead the 'date, place or time' of the fraud, so long as they use an 'alternative means of injecting precision and some measure of substantiation into their allega-

tions of fraud.'" *Rolo*, 155 F.3d at 658 (citing *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984)). The particularity requirement of the PSLRA, moreover, has been interpreted to mean "that a plaintiff must provide a list of all relevant circumstances in great detail." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 984.

Lead Plaintiffs do not allege specific facts regarding when the problems at EIC occurred beyond the conclusory "in or about May 1998." Second Amended Complaint at ¶ 50. Indeed, Lead Plaintiffs allege the System caused EIC data access problems without asserting the basis for a belief that Defendants were notified of the problems before they issued the 18 May 2000 Press Release. *Id.* at ¶¶ 49–50.

### e) *The 1997 Form 20–F*

Lead Plaintiffs allege that on 26 June 1998, Defendants filed a false and misleading 1997 Form 20–F with the SEC. *Id.* at ¶ 51. The 1997 Form 20–F, signed by Arzi, set forth several factual statements detailing the capabilities of the System. *Id.* The 1997 Form 20–F also stated: "To date the Company has not experienced any significant product returns or requests for repairs." *Id.*

Lead Plaintiffs assert that, contrary to information in the 1997 Form 20–F, "a number of customers, including among others, CIBC, Advanta, EIC and Safilo USA ("Safilo"), had expressed a desire to return the System or were demanding that the System be substantially reconfigured to meet their needs." *Id.* at ¶ 53. Nevertheless, the identification of four customers who allegedly experienced problems with a new and highly technical product, especially without any allegation as to the relative fraction of NSL's total business they comprised, does not equal "widespread" failure of the product and cannot support a fraud

claim. *See Tuchman v. DSC Communications Corp.*, 818 F.Supp. 971, 977 (N.D.Tex.1993); *see also In re Health Management Sys., Inc. Sec. Litig.*, No. 97–1865, 1998 WL 283286, at *4 (S.D.N.Y. June 1, 1998) (holding allegations insufficient because they did not specify the customers involved and the nature of their problems).

In *Tuchman,* the plaintiffs alleged "customer defections ... began to increase markedly, resulting in large-scale cancellation of orders, returns of equipment, and a fall-off in new orders." *Tuchman,* 818 F.Supp. at 977. The court determined that because the plaintiffs failed to state which customers defected, how many customers defected, or what equipment was returned, the complaint failed to meet the pleading requirements of Rule 9(b). *Id.*

Lead Plaintiffs allege that problems with the System were apparent after it was installed at CIBC and Safilo in February 1998, at Advanta in April 1998, and at EIC in May 1998. Second Amended Complaint at ¶¶ 35, 42, 50, 53. Lead Plaintiffs, however, fail to allege whether the customers identified represent a "significant" portion of NSL business. *Id.* Lead Plaintiffs also fail to allege any facts to support the allegation that these customers "had expressed a desire to return the System" or when this alleged desire was communicated to NSL. *Id.*

Lead Plaintiffs also allege that "in February 1998 NSL attempted to install [the System] at CIBC .... CIBC has never paid NSL for the ... System." Second Amended Complaint at ¶ 35. In addition, Lead Plaintiffs state that "in April 1998, several CIBC employees visited Advanta to observe a demonstration of the ... System." *Id.* at ¶ 43. As well, Lead Plaintiffs allege that "[a]ccording to an Advanta employee ... Advanta abandoned its use of the ... System, and has since purchased a call center system from one of NSL's competitors." *Id.* at ¶ 44. None of these allegations, however, bear a temporal element regarding when complaints were made to NSL or when the System was abandoned. It appears from the facts alleged that NSL installed the System at CIBC in February and CIBC visited Advanta in April. *Id.* at ¶¶ 35, 43. The Second Amended Complaint, however, does not indicate when either CIBC or Advanta complained about, or abandoned, the System.

Pursuant to the PSLRA, "a plaintiff must demonstrate how the earlier statements were misleading at the time they were made." *Shapiro,* 964 F.2d at 284. Lead Plaintiffs fail to allege sufficient facts to demonstrate that the 1997 Form 20–F was misleading or false when issued. Nor do Lead Plaintiffs provide sufficient facts to support an inference Defendants knew the 1997 Form 20–F was materially misleading when filed with the SEC. Second Amended Complaint at ¶¶ 51–53.

### f) *The 8 September 1998 Press Release*

In the 8 September 1998 Press Release, NSL announced the launch of its Professional Services Division. *Id.* at ¶ 61. Lead Plaintiffs take issue with the following statement by Sturdy:

> In today's competitive call center environment, customer-service oriented companies are looking for more than just great technology when improving their operations. Our suite of value-added professional services provide customers a comprehensive program that encompasses implementation, technical training and call center consultative services that go beyond the technology.

*Id.*

■ Lead Plaintiffs allege that the promotion by NSL of its "great technology" and the provision of services "that go

beyond the technology" on 8 September 1998 were false and misleading. *Id.* at ¶ 62. Lead Plaintiffs assert that the 8 September 1998 Press Release was materially misleading based on the comments of an unidentified Safilo employee. *Id.* According to this unidentified Safilo employee, the System crashed in the Spring of 1998 and NSL provided little technical assistance troubleshooting the problems. *Id.* at 62. Lead Plaintiffs allege Safilo acquired the System on or about February 1998 but provided no specific occasions when the System crashed or what attempts were made to obtain assistance from NSL. *Id.* at ¶ 53.

When the 8 September 1998 Press Release is considered in the context in which it occurred, the alleged misrepresentation is not so obvious. *See In re Donald Trump Casino Sec. Litig.,* 7 F.3d at 364 ("[A] statement or omission must be considered in context."). The 8 September 1998 Press Release focused on the announcement of the Professional Services Division. Second Amended Complaint at ¶ 61. Lead Plaintiffs assert that Defendants failed to disclose System problems. *Id.* Defendants, however, were not discussing the System in the 8 September 1998 Press Release. *Id.*

Lead Plaintiffs fail to sufficiently tie the allegation of the single, unidentified Safilo employee to the Defendants in such a way as to permit an inference that the comments in the 8 September 1998 Press Release were false when made. Second Amended Complaint at ¶ 62.

### iii. *Statements Of Corporate Optimism or Puffery*

■ Several of the alleged "misrepresentations" set forth in the Second Amended Complaint appear to represent nothing more than nonactionable "puffery" or accurate reports of historical earnings. The Third Circuit has held that "[v]ague and general statements of optimism constitute no more than 'puffery' and are understood by reasonable investors as such." *In re Advanta Corp. Sec. Litig.,* 180 F.3d at 538 (citing *Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1428 n. 14). Moreover, "factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *In re Advanta Corp. Sec. Litig.,* 180 F.3d at 538; *see also Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir.1997) (No reasonable investor would rely on vague, optimistic statements because they do not contain information of reasonable specificity or impart a definite guarantee of corporate performance); *In re Milestone Scientific Sec. Litig.,* 103 F.Supp.2d 425, 457 (D.N.J. 2000).

■ "[S]tatements of subjective analysis or extrapolation, such as opinions, motives, and intentions" are "soft information" and hence immaterial for purposes of Rule 10b–5. *In re Craftmatic Sec. Litig.,* 890 F.2d at 642; *accord Lasker v. New York State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir.1996); *In re Donald Trump Sec. Litig.,* 7 F.3d at 369 n. 11 ("The term 'soft information' refers to statements of subjective analysis or extrapolation, such as opinion, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts.").

General, non-specific statements of optimism or hope

> even if arguably misleading, do not give rise to a [F]ederal securities claim because they are not material: there is no "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

*In re Advanta Corp. Sec. Litig.*, 180 F.3d at 538 (quoting *TSC Indus., Inc.*, 426 U.S. at 449, 96 S.Ct. 2126); *see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 811 (2d Cir.1996) (puffery cannot mislead the reasonable investor and cannot constitute actionable statements under the securities laws); *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993) (statements that "[the company has] an expected annual growth rate of 10% to 30% over the next several years" and "is poised to carry the growth and success ... well into the future" are not material as a matter of law.).

The 25 February 1998 Press Release announced fourth quarter 1997 earnings of $4.6 million for NSL; the 6 May 1998 Press Release announced first quarter 1998 earnings of $4.8 million; and the 5 August 1998 Press Release announced second quarter 1998 earnings of $5.1 million. Second Amended Complaint at ¶¶ 37, 45, 56. Lead Plaintiffs do not allege that the published earnings figures were false. Instead, Lead Plaintiffs allege that statements made along with the earnings announcements were materially misleading. *Id.* at ¶¶ 38, 46, 57.

■ It appears, nevertheless, that the following statements constituted nothing more than mere "puffery":

I trust that in 1998 we will enjoy another year of continuous growth. Second Amended Complaint at ¶ 37 (citing the 25 February 1998 Press Release).

The first quarter of 1998 shows that NICE continues to benefit from its technological leadership and strong competitive position. *Id.* at ¶ 45 (citing the 6 May 1998 Press Release).

[W]e are focusing on the call center market which is expected to grow significantly in the coming years. *Id.*

Results for the second quarter reflect our improved position in the call center market. *Id.* at ¶ 56 (citing the 5 August 1998 Press Release).

Our leading position in the North American call center market is consistent with Nice's dominance in the financial institutions and air traffic control markets. *Id.*

The call center market is an immense and growing business sector worldwide. It generates high margins and has the potential for increasing our revenues significantly by the turn of the century. *Id.* at ¶ 59 (citing the 17 August 1998 Press Release).

Each of the above referenced statements is the type of puffery that has been found to be immaterial as a matter of law. *See e.g. In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1427 (finding statement "company believed it could continue to grow net earnings at a faster rate than sales" to be inactionable puffery); *In re Milestone Scientific Sec. Litig.*, 103 F.Supp.2d at 458 (the statement "we are very pleased with the amount of orders we have ... so far and expect even more orders in the ensuing months" deemed puffery); *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d at 927–28 (statement "[MobileMedia] believes that it will be one of a limited number of companies that will have these resources" is the type of "general, non-specific statement of optimism or hope that has been found to be inactionable.").

The above referenced statements, moreover, are soft statements of belief or past financial success and are not the type of statements that have been found capable of "duping" the market. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1427; *see also In re Advanta Sec. Litig.*, 180 F.3d at 537–38 (statement that "[d]espite industry-wide pressure on credit card asset quality, Advanta continued to produce

better-than-industry credit measures and achieved excellent growth and returns throughout our core business," found inactionable); *Lasker,* 85 F.3d at 59 (statement that "business strategies would lead to continued prosperity" found to be immaterial puffery).

The information in the above referenced portions of the Second Amended Complaint, moreover, is not the type of information the ordinary investor would likely find important to his or her investment decision. *In re Advanta Sec. Litig.,* 180 F.3d at 538. Accordingly, these statements are immaterial even if, as Lead Plaintiffs contend, they were made without a reasonable basis. This type of puffery cannot serve as the basis for liability under Federal securities law. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1427.

Insofar as the Second Amended Complaint relies on statements made in the 25 February 1998 Press Release, the 6 May 1998 Press Release, the 5 August Press Release, and the 17 August 1998 Press Release, these allegations are dismissed.

b. *15 U.S.C. § 78u–4(b)(2)—Scienter*

As discussed, in order to survive the Motion to Dismiss, Lead Plaintiffs must "state with particularity facts giving rise to a strong inference that [the Defendants] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *Oran,* 226 F.3d at 288. Defendants contend that Lead Plaintiffs have not plead facts sufficient to give rise to a "strong inference" of scienter. Moving Brief at 22.

In *In re Advanta Corp. Sec. Litig.,* the Third Circuit held that the PSLRA essentially adopted the pre-PSLRA Second Circuit standard for pleading scienter, which required allegations that gave rise to a "strong inference" of fraudulent intent. 180 F.3d at 533–34. Previously, that could be accomplished in the Second Circuit by alleging facts to show that defendants had both motive and opportunity to commit fraud, or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 268–69 (2d Cir.1993) (citations omitted).

As discussed, a key Congressional objective in passing the PSLRA was to "establish ... *more stringent* pleading requirements" than had been imposed by the Courts of Appeals under Rule 9(b). H.R. Conf. Rep. No. 104–369, at 41, reprinted in 1995 U.S.C.C.A.N. 730, 740 (emphasis added). Specifically, Congress declared:

> The Conference Committee language is based *in part* on the pleading standard of the Second Circuit.... Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts must, in turn, give rise to a "strong inference" of the defendant's fraudulent intent. *Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard ....* For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.

*Id.* at 41 & n. 23, reprinted in 1995 U.S.C.C.A.N. at 740 & n. 23. President Clinton, moreover, vetoed the PSLRA on the grounds that it imposed excessively stringent pleading requirements:

> I believe that the pleading requirements of the Conference Report with regard to a defendant's state of mind impose an unacceptable procedural hurdle to meritorious claims being heard in Federal courts. I am prepared to support the high pleading standards of the U.S.

Court of Appeals for the Second Circuit—the highest pleading standard of any Federal circuit court. But the conferees make crystal clear in the Statement of Managers their intent to raise the standard even beyond that level. I am not prepared to accept that.

141 Cong. Rec. H15214 (daily ed. 20 Dec. 1995) (veto message of President Clinton). Both houses of Congress subsequently overrode the President's veto and the PSLRA was enacted into law without changes to the pleading standard.

The Third Circuit in *In re Advanta Corp. Sec. Litig.*, nevertheless, found the legislative history of the PSLRA "contradictory and inconclusive." 180 F.3d at 533. According to the Third Circuit, the use of the "strong inference" language in the statute is sufficient evidence that Congress intended to codify the Second Circuit standard. *Id.* at 533–34; *but see Greebel*, 194 F.3d at 194–97 (holding that the PSLRA imposes a more rigorous pleading standard than applied by any of the Courts of Appeals prior to the enactment of the statute); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 549–51 (6th Cir.1999) (same); *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d at 974, 979 (same); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282–87 (11th Cir.1999) (same). Therefore, pursuant to the law of this Circuit, the Lead Plaintiffs may establish a "strong inference" of scienter by either " 'alleging facts to show that defendants had both motive and opportunity to commit fraud' " or " 'by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *Oran*, 226 F.3d at 288–89 (quoting *In re Burlington Coat*

*Factory Sec. Litig.*, 114 F.3d at 1418); *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d at 534–35.[17]

i. *Allegations of Motive and Opportunity*

Lead Plaintiffs allege Defendants had the opportunity to commit fraud because they were "principal executive officers and substantial shareholders of the company." Opposition Brief at 34. Specifically, Lead Plaintiffs allege Defendants ran the operations of NSL and controlled the dissemination of corporate information, including filings with the SEC, reports to shareholders, and press releases. Second Amended Complaint at ¶ 16. Lead Plaintiffs also argue Defendants approved, ratified, or failed to correct misleading statements being issued about the System. *Id.*

Lead Plaintiffs also contend that the Second Amended Complaint alleges facts demonstrating Defendants had a strong motive to commit fraud. Opposition Brief at 35. Lead Plaintiffs allege Defendants were motivated to inflate the price of Nice ADSs used as consideration for the acquisition of IBS. *Id.* at 35. Lead Plaintiffs further allege Defendants were motivated to commit fraud by their desire to secure market share in the call center market. *Id.*; Second Amended Complaint at ¶ 42.

As mentioned, the Third Circuit permits allegations of scienter based upon a showing of motive and opportunity. *Oran*, 226 F.3d at 288; *Greebel*, 194 F.3d at 197 ("Like the Third Circuit, we caution that 'catch-all allegations that defendants stood to benefit from wrongdoing and had the

---

17. In *Novak*, the Second Circuit recently held that the PSLRA "did not change the basic pleading standard for scienter in [the Second Circuit]." 216 F.3d at 311. The Second Circuit acknowledged, however, that the PSLRA did not adopt the "motive and opportunity" language from prior Second Circuit case law. *Id.* Nevertheless, according to the Second Circuit, prior case law may be helpful in applying the "strong inference" standard. *Id.*

opportunity to implement a fraudulent scheme' are not sufficient to plead scienter.") (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 535); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418, 1422. Motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).

Lead Plaintiffs maintain that a temporary increase in the value of NSL stock enabled Defendants to consummate the IBS acquisition with artificially inflated Nice ADSs. Second Amended Complaint at ¶ 42. Specifically, Lead Plaintiffs assert that "NSL issued 35,000 ADSs, purportedly valued at $1.6 million, and paid an additional $3.9 million in cash as consideration for the purchase." *Id.* at ¶ 40.

■ Stock sales may support an inference of scienter only if such sales were "unusual in scope or timing." *Oran*, 226 F.3d at 290 (citing *In re Advanta Sec. Litig.*, 180 F.3d at 540); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1424 (Plaintiffs "must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter."); *Leventhal v. Tow*, 48 F.Supp.2d 104, 115 (D.Conn.1999) ("allegation defendants motive was to artificially inflate [the] stock price ... in order to get more favorable terms in the stock-for-stock transactions and issuance of debentures insufficient to establish scienter and routinely rejected by the courts"). Moreover, "causing temporary inflations of price through the dissemination of false information hurts the long-term stock price of the company and thereby presumably hurts managerial compensation." *In*

*re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1423 n. 12; *see also Melder v. Morris*, 27 F.3d 1097, 1102–03 (5th Cir. 1994) ("[P]laintiffs' allegation of motive— basically that the defendant officers and directors were motivated by incentive compensation—would effectively eliminate the state of mind requirement as to all corporate officers and defendants."); *Malin v. Ivax Corp.*, 17 F.Supp.2d 1345, 1361 (S.D.Fl.1998) (Motive of maintaining stock price in order to "maintain the reputation of the company and facilitate mergers and acquisitions" held insufficient "[b]ecause such motives can be ascribed to virtually all corporate officers and directors.").

■ Defendants announced the IBS acquisition in the 3 March 1998 Press Release. Second Amended Complaint at ¶ 40. The 3 March 1998 Press Release stated NSL had issued 35,000 ADSs valued at $1.6 million and paid $3.9 million in cash to complete the IBS transaction. *Id.* Lead Plaintiffs, however, identify only a single transaction, preceded by two alleged misrepresentations—the 4 February 1998 Press Release and the 25 February 1998 Press Release. *Id.* at ¶¶ 30, 37, 40. Moreover, only thirty-percent of the purchase price consisted of stock. *Id.* at ¶ 40. The quantity of stock used in the IBS transaction, therefore, was not so large as to support the necessary "strong inference" of scienter. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1424.

The Lead Plaintiffs provide nothing more than a conclusory allegation that Defendants were motivated to inflate the price of Nice ADSs. *Id.* Lead Plaintiffs do not particularize the facts upon which this allegation is based. For example, Lead Plaintiffs allege that the NSL stock price was "as high as $45.75" on 3 March 1998. *Id.* at ¶ 40. Lead Plaintiffs, however, fail to delineate whether the 3 March 1998 price was higher or lower than the stock

price in January or February. *Id.* Lead Plaintiffs further allege NSL issued 35,000 Nice ADSs, but fail to allege whether this number was a "quantit[y] that [was] suspicious enough to support the necessary inference of scienter."[18] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1423; *see Oran*, 226 F.3d at 290 ("if the stock sales were unusual in scope or timing, they may support an inference of scienter") (citing *In re Advanta Sec. Litig.*, 180 F.3d at 540).

The motive of Defendants to commit securities fraud in order to effectuate the purchase of IBS is not readily apparent and is unsupported by sufficient factual allegations. *Oran*, 226 F.3d at 289–90; *Novak*, 216 F.3d at 308.

■ In addition, the allegation that Defendants made false and misleading statements to secure market share is similarly insufficient to demonstrate Defendants had a motive to commit fraud. *See San Leandro*, 75 F.3d at 814 ("[A] company's desire to maintain a high bond or credit rating" does not qualify as a sufficient motive for pleading fraud. "If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."). Any advantage achieved by making false or misleading positive statements about the NSL System would eventually be negated by the alleged defects. *See e.g. In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp.2d 290, 294 (S.D.N.Y.1999); *In re Boeing Sec. Litig.*, 40 F.Supp.2d 1160, 1174 (W.D.Wash. 1998) ("A desire to increase market share, like the desire to remain profitable, is a generic motive that fails to satisfy the heightened pleading standards for scienter under the [Reform Act].").

Lead Plaintiffs fail to allege particularized facts which give rise to a strong inference of scienter based on motive and opportunity. 15 U.S.C. § 78u–4(b)(2); *see also In re Advanta Sec. Litig.*, 180 F.3d at 535.

ii. *Allegations of Conscious Misbehavior*

Lead Plaintiffs assert that the Complaint sufficiently alleges specific facts which "give rise to a strong inference of conscious misbehavior by [D]efendant[s]." Opposition Brief at 29. Lead Plaintiffs contend they adequately plead scienter because:

Positive representations by Defendants were in contradiction to underlying System problems, *id.* at 29;

The alleged misstatements by Defendants concerned products critical to the overall performance of NSL, *id.* at 30;

The magnitude of the problems affecting the System support an inference of scienter, *id.* at 31;

Defendants were testing the System before and during the Class Period so they must have been aware of System problems, *id.* at 32;

The proximity of the positive statements to the withdrawal of the System from the market, gives rise to a strong inference of conscious wrongdoing by Defendants, *id.* at 32–33; and

As the principal executive officers of NSL responsible for corporate operations, the Defendants were involved in drafting, producing, reviewing, and dis-

---

**18.** The Second Amended Complaint indicates:
Each NSL ADS represents one ordinary share. According to the 1997 [Form] 20–F, as of [11] May[ ] 1998, NSL had outstanding more than eleven million ordinary shares.
Second Amended Complaint at ¶ 12.

seminating the alleged materially false statements. *Id.*

■ A strong inference of fraudulent intent may be established by "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d at 39 (citing *Shields*, 25 F.3d at 1128; *In re Advanta Sec. Litig.*, 180 F.3d at 535).

To survive dismissal, Lead Plaintiffs must allege "reckless conduct by the [Defendants] which is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d at 39 (citing *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978)). "It is sufficient for [Lead Plaintiffs] to allege 'defendants' knowledge of facts or access to information contradicting their public statements.'" *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d at 40 (quoting *Novak*, 216 F.3d at 308). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *In re Carter–Wallace Sec. Litig.*, 220 F.3d at 40 (citing *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996)).

■ Lead Plaintiffs contend they have adequately alleged scienter because the Second Amended Complaint identifies numerous positive statements and explains why the statements are false. Opposition Brief at 29–30. Nevertheless, "[a] plaintiff cannot simply couple [ ] factual statement[s] with [ ] conclusory allegation[s] of fraudulent intent to adequately plead scienter." *Sunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 661 (W.D.Pa.1999); *see*

*also In re Advanta Corp. Sec. Litig.*, 180 F.3d at 539 (allegation that "defendants acted 'knowingly' " is insufficient); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1353–54 (S.D.Ca.1998) ("Simply alleging that defendants knew the statements to be false, and therefore defendants must have acted recklessly, circumvents the requirement that plaintiffs plead a strong inference of scienter.").

■ Lead Plaintiffs further contend that, because the misrepresentations of Defendants concern a product critical to the overall performance of NSL, an inference of scienter arises. *Id.* at 30. Lead Plaintiffs rely on *Cosmas v. Hassett*, 886 F.2d 8 (2d Cir.1989), wherein a defendant, in an alleged effort to elevate stock prices, issued public statements that sales to China were going to increase. *Id.* at 11–12. At the time the positive statements were made, however, China had imposed import restrictions on the products the company normally sold. *Id.* The court allowed an inference that the defendants had knowledge of the import restrictions because they eliminated a potentially significant source of income for the defendants. *Id.* at 13.

The instant matter, however, more closely resembles the situation in *Allison*. There, the plaintiffs alleged "product development problems, customer acceptance problems and the impact of these problems on [defendant's] revenue generating stream." *Allison*, 999 F.Supp. at 1354. Unlike *Cosmas* "where knowledge of a single factual circumstance (i.e. import restrictions) is sufficient, in combination with the alleged motive, to establish conscious behavior, the present complaint is less clear, less focused, and fails to allege strong circumstantial factual allegations of conscious behavior." *Id.*

### iii. *Fraud By Hindsight*

It appears, moreover, the Plaintiffs are impermissibly attempting to rely on "fraud by hindsight." Moving Brief at 24. "Fraud by hindsight" has been defined as the "attempt to impose liability on management for unrealized economic predictions." *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d at 925; *Novak*, 216 F.3d at 309 ("we have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight' "); *see also Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1040 (6th Cir. 1991); *Castlerock Management, Ltd. v. Ultralife Batteries, Inc.*, 68 F.Supp.2d 480, 488 (D.N.J.1999) ("plaintiffs cannot rely on a theory of 'fraud by hindsight,' a theory soundly rejected by several courts"); *Zucker v. Quasha*, 891 F.Supp. 1010, 1014 (D.N.J.), *aff'd* 82 F.3d 408 (3d Cir.1996).

To be actionable, "a statement or omission must be misleading at the time it was made." *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d at 925; *Castlerock*, 68 F.Supp.2d at 488 (inference of knowledge on the part of defendants cannot be drawn based solely on the lapse of time between the offering documents and the disclosure of production problems); *Zucker*, 891 F.Supp. at 1014. Liability cannot be imposed on the basis of subsequent events. *Novak*, 216 F.3d at 308 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."); *see also Zucker*, 891 F.Supp. at 1016–17 (filing for bankruptcy four months after offering, could not be used to support a claim that corporation was in a precarious financial position at the time of the offering).

Lead Plaintiffs allege the System was "plagued with 'translation' problems." *Id.* at ¶ 34. According to Lead Plaintiffs, NSL "employees with personal knowledge of the pertinent facts" maintain "translation problems created significant difficulties for call centers" causing many of the calls received to be untraceable. *Id.* Lead Plaintiffs, however, do not provide specifics about when NSL learned of the alleged translation problems, or which and how many call centers had translation problems, and at what point in time the problems occurred. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309; *San Leandro*, 75 F.3d at 812.

Lead Plaintiffs also allege "Automated, a distributor of NSL products ... agreed to distribute the System .... [h]owever, during the ... Class Period, due to the defects plaguing the ... System, Automated was unable to distribute the System." *Id.* at ¶ 36. Lead Plaintiffs, however, fail to state when Automated agreed to distribute the System or when Automated determined the System was not functional. *Id.* In the absence of a temporal parameter, this allegation fails to assist in drawing inferences about when Defendants should have known or become aware of the severity of underlying System problems.[19]

Lead Plaintiffs further allege Defendants consciously failed to disclose their decision to relocate the corporate research and development department from Canada to Israel in or about May 1998. Second

---

**19.** According to Lead Plaintiffs, in September 1999, Automated filed a lawsuit against NSL in the Superior Court of New Jersey alleging breach of contract and fraud. Second Amended Complaint at ¶ 36.

Defendants contend, however, that "Automated is a disgruntled distributor which was terminated by NSL in April 1999 after Automated was allegedly unsuccessful in distributing the Products." Moving Brief at 20. According to Defendants, NSL moved to dismiss Automated's complaint on 28 January 2000 for failure to state a claim. *Id.*

Amended Complaint at ¶ 54. According to Lead Plaintiffs, "the Company's R & D department in Israel lacked the resources and technical knowledge to support such a change." *Id.* Lead Plaintiffs, however, do not allege specific facts to support this conclusory allegation. *Id.*

As discussed, Lead Plaintiffs must allege "defendants' knowledge of facts or access to information contradicting their public statements." *Novak,* 216 F.3d at 308. Lead Plaintiffs, however, do not allege facts sufficient to give rise to a strong inference Defendants engaged in "conduct which [was] highly unreasonable and which represent[ed] an extreme departure from the standards of ordinary care." *In re Carter–Wallace, Inc. Sec. Litig.,* 220 F.3d at 39; *Rolf,* 570 F.2d at 47.

iv. *Allegations of Scienter Based On Position*

 Lead Plaintiffs assert that Defendants had knowledge of the alleged defects in the System based on their positions in the corporation. Opposition Brief at 33. "Generalized imputations of knowledge," however, "do not suffice regardless of the defendant's position within the company." *Oran,* 226 F.3d at 290 (quoting *In re Advanta Sec. Litig.,* 180 F.3d at 539); *see also Sunquest,* 40 F.Supp.2d at 661.

Allegations of scienter based upon the status of a defendant as a company executive, manager or board member have been rejected by various courts. *See e.g. In re Advanta Sec. Litig.,* 180 F.3d at 539 (finding "conclusory assertions that the defendants acted 'knowingly' as well as blanket statements that defendants must have been aware . . . by virtue of their positions within the company" insufficient to plead scienter); *Maldonado v. Dominguez,* 137 F.3d 1, 10 (1st Cir.1998) (Allegations that defendant, "because of his position within the company, 'must have known' a statement was false or misleading are precisely

the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny."); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir.1992) ("It is well established that a pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of the facts.") (internal quotation omitted).

Lead Plaintiffs do not allege particularized facts sufficient to give rise to a strong inference Defendants knew the alleged misrepresentations were false when uttered, or that the conduct of Defendants in issuing the Press Releases was "highly unreasonable." *In re Carter–Wallace, Inc. Sec. Litig.,* 220 F.3d at 39; *see also In re Advanta Sec. Litig.,* 180 F.3d at 539; *Sundstrand,* 553 F.2d at 1045; *accord In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989).

Lead Plaintiffs fail to allege specific "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" on the part of Defendants. *In re Carter–Wallace, Inc. Sec. Litig.,* 220 F.3d at 39; *In re Advanta Sec. Litig.,* 180 F.3d at 535. Lead Plaintiffs were required to plead with factual particularity how the representations by Defendants were misleading at the time they were made. *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1547–48 n. 7 (9th Cir.1994); *Wallace,* 1997 WL 602808, at *16. Lead Plaintiffs have not done this. The allegations made by Lead Plaintiffs, therefore, are insufficient to produce a strong inference of fraudulent intent by Defendants.

4. *The Control Person Claims*

 In the Second Amended Complaint, Plaintiffs allege the Individual Defendants violated Section 20(a) of the Exchange Act "by virtue of their positions as senior executive officers, directors, and controlling shareholders of" NSL. Second Amended Complaint at ¶ 99. Section 20 of

the Exchange Act provides for secondary liability of "control persons." 15 U.S.C. § 78t.[20] In order to maintain a cause of action for control person liability under Section 20(a), a plaintiff is required to establish:

(1) an underlying violation by a controlled person or entity; (2) that the defendants are controlling persons; and (3) that they were in some meaningful sense culpable participants in the fraud.

*Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998); *see also In re Cendant Corp. Sec. Litig.,* 81 F.Supp.2d 550, 558 (D.N.J.2000).

■ Liability under Section 20(a) is predicated upon an independent violation of "this chapter or the rules or regulations thereunder." 15 U.S.C. § 78t–1(a); *Greebel,* 194 F.3d at 207. Claims under Section 20(a), therefore, are "derivative—requiring proof of a separate underlying violation of the Exchange Act." *In re Milestone Scientific Sec. Litig.,* 103 F.Supp.2d at 474; *In re Advanta Corp. Sec. Litig.,* 180 F.3d at 541; *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 703 (2d Cir.1994) ("[T]o state a claim under [Section] 20A, a plaintiff must plead a predi-cate violation of the '34 Act [sic] or its rules and regulations.")

Because Lead Plaintiffs have not plead a predicate violation of Section 10(b) or Rule 10b–5, the Section 20(a) claim must be dismissed.

*Conclusion*

For the reasons stated, the Motion to Dismiss is granted. The Second Amended Complaint is dismissed, with prejudice.[21]

---

**20.** Section 20 provides, in relevant part:
(a) Joint and several liability; good faith defense. Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a) (2000).

**21.** Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, "leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). A District Court, nevertheless, "may deny leave to amend on the grounds that amendment would cause undue delay or prejudice, or that amendment would be futile." *Oran,* 226 F.3d at 291 (citations omitted).

Lead Plaintiffs have not sought leave to amend the Second Amended Complaint. As discussed, moreover, Lead Plaintiffs have twice amended their complaint in this matter. Significantly, at the time Lead Plaintiffs were offered the opportunity to file what is now the Second Amended Complaint, they were advised that it was their last chance to amend the complaint. 24 January 2000 Conference, Tr. at 1:10–2:23. It appears, therefore, any further amendments would be futile. *See Oran,* 226 F.3d at 291 (upholding District Court's denial of plaintiffs' request for leave to amend where plaintiffs had already amended their complaint once, the case was one and one-half years old and no discovery had been taken).